UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

UNITED STATES OF AMERICA,

       Plaintiff,

v.

TERRANCE WAYNE VANOCHTEN,

       Defendant.

_____/

Case no. 1:23-cr-29

Hon. Paul L. Maloney
United States District Judge

## DEFENDANT'S SENTENCING MEMORANDUM

On October 4, 2023, Terrance Wayne VanOchten will stand before this Honorable Court to be sentenced for possession of unregistered destructive devices in violation of 26 U.S.C. §§ 5861(d), 5841, and 5871. Mr. VanOchten has received the Presentence Investigation Report (PSR) and met with counsel to discuss it. (ECF No. 38, PSR, PageID.193). Mr. VanOchten has three outstanding guideline objections to the PSR. Two of Mr. VanOchten's objections are contained in this memorandum. The third objection, to paragraph 32, will be filed upon receipt of a report from Mr. VanOchten's retained expert regarding the alleged destructive device in that paragraph.

Overall, as the Court is aware, the principle and basic mandate of 18 U.S.C. § 3553(a) requires this Honorable Court to impose a sentencing "sufficient, but not greater than necessary" to comply with the four (4) purposes set forth in § 3553(a)(2):

**§ 3553. Imposition of a sentence.**

**(a) Factors to be considered in imposition of a sentence.** – The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider –

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2)
(3) the need for the sentence imposed –

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. . .

18 U.S.C. § 3553(a)(2).

In *United States v. Ferguson*, 456 F.3d 660, 665 (6th Cir. 2006), the court held that after *United States v. Booker*, 543 U.S. 220 (2005), a judge must impose the lowest sentence that is "minimally sufficient" to meet those goals regardless if that sentence is probation, time served, a mandatory minimum sentence, the statutory maximum, or somewhere in between.

Terrance VanOchten is 57 years old and remorseful for committing this offense. Before his arrest that led to this case, he had very minimal criminal history. He has worked for his entire adult life. He has written a letter to the Court. (Attachment 1, Letter). Four letters of support have been submitted on his behalf. (Attachment 2, Letters of Support).

The letters describe Mr. VanOchten as hardworking, willing to help others, and remorseful for committing this offense.

Mr. VanOchten has been consistently employed since he was 16 years old. He has held the same employment since 2016, as a coating machine operator/mixer. (ECF No. 38, PSR, PageID.209). He has typically held jobs for a number of years. He has never been fired by an employer. *Id.*

Mr. VanOchten regrets committing this offense. He has demonstrated his remorse by voluntarily admitting his conduct to law enforcement, cooperating with the government, and pleading guilty in a timely manner. He participated in the presentence interview and admitted his actions. He told the presentence writer why he committed the offense, described his remorse, and the consequences of the offense on himself, and his family.

This offense has been a difficult learning experience for Mr. VanOchten. He is having his first significant contact with the criminal justice system at a time when he should be thinking about retirement. Mr. VanOchten remains optimistic about his future. He intends to make better decisions in the future and return to a law abiding and productive life.

There are no allegations that Mr. VanOchten exploded pipe bombs at any time. The black powder used in this case is at least ten years old. The black powder used in committing this offense was produced by GOEX, Inc. The powder is a FFg Superfine Black Rifle Powder. The materials for the pipe bombs were all contained in one ammunition container. (See Attachment 3). The black powder container is metal.

GOEX's website states that it has been producing ammunition in the United States for over 200 years.[1] However, GOEX has gone through several ownership changes in recent years. In January 2022, the assets of GOEX were purchased by Estes Energetics.[2] On September 6, 2023, counsel's office reached out to the CEO of Estes Energetics and asked whether GOEX was selling black powder in metal containers. The CEO stated that the change to plastic containers "happened a while back, prior to us purchasing the company. The previous owner (until early 2022) was Hodgdon Powder Company since about 2008." On September 8, 2023, counsel's office reached out to Hodgdon Powder Company and spoke the Vice President of Research & Development.[3] Counsel was informed that Hodgdon bought GOEX in 2009. Hodgdon changed to packaging black powder in plastic containers in 2011 or 2012. Consequently, because the powder was in a metal container, it was sold in 2012 or earlier.

At a young age, Mr. VanOchten felt that his calling was to go into the military. After listening to his father's stories about his time in the Vietnam War, Mr. VanOchten was inspired to enlist. However, his parents steered him away from it because they wanted him to be safe at home and his father told him that the military '*will own him.*' When he turned 18, Mr. VanOchten's father encouraged him to not join the military but to attend college instead. He attended college on a Pell Grant but stopped attending school despite being only a few credits shy of obtaining his associate's degree. Mr. VanOchten's biggest regret

---

[1] https://goexpowder.com/company/about-us-2/ (accessed September 15, 2023).
[2] https://www.prnewswire.com/news-releases/estes-energetics-to-extend-the-goex-black-powder-production-legacy-301470912.html (accessed September 15, 2023).
[3] https://hodgdon.com/steve-faintich/ (accessed September 15, 2023).

is not joining the military. Mr. VanOchten romanticized the idea of brotherhood and the close friendships that he believed would come out of the military. He grew up without many friends and thought that he would fit in. He dreamt of having the support and lifelong camaraderie and bonds and craved the ability to share similar stories that he heard growing up. While never joining the military, it was with this mindset that Mr. VanOchten began collecting military surplus and gear.

Mr. VanOchten has accepted responsibility for his offense. He regrets the decisions that have led to his incarceration. Mr. VanOchten is working on his personal growth. Mr. VanOchten reported stopped drinking after the instant offense and intends to remain sober. Prior to his incarceration, he was going to therapy. Mr. VanOchten is looking towards the future. He has many positive influences in his life who will support him, including his girlfriend and family members. Upon release, Mr. VanOchten wants to continue therapy. His therapist had a positive impact on his mental health. He further hopes his therapist can provide tools to help him remain sober. Mr. VanOchten is anxious to return to work. His previous employer, ITW Coating Products, would like him to return. Mr. VanOchten remains optimistic about his future.

**Objections to Paragraphs 30 and 31 of the Presentence Investigation Report**

Mr. Vanchten is not a "prohibited person" under the law. As the Fifth Circuit has recently recognized, the government cannot prohibit a person from possessing firearms due to their use of marijuana. Accordingly, in paragraph 30, Mr. VanOchten's base offense

5

level should be 18. In paragraph 31, Mr. VanOchten should receive a specific offense characteristic of two levels for illegally possessing three to seven firearms.

Under Section 2K2.1, a defendant who is a "prohibited person" receives a higher base offense level. To define a prohibited person, the guidelines defer to federal statutes. A prohibited person is one who is prohibited from possessing a firearm under 18 U.S.C. § 922(g) or § 922(n). U.S.S.G. § 2K2.1 comment. n.3.

Section 922(g)(3) prohibits a person "who is an unlawful user of or addicted to any controlled substance" from possessing firearms. Mr. VanOchten was not charged under Section 922(g)(3). However, Mr. VanOchten admitted that "he smoked a bowl of marijuana every three nights to relieve stress." (ECF No. 38, PSR, PageID.199). Based on this confession, the PSR determined that Mr. VanOchten was prohibited from possessing firearms under federal law.

However, Section 922(g)(3) is unconstitutional—at least as applied to marijuana users. The Second Amendment provides: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. "[T]he Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2125 (2022). "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* In such a case, the government bears the burden to "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126.

Mr. VanOchten is part of "the people" whom the Second Amendment protects. He is not a felon. "Even as a marihuana user, [Mr. VanOchten] is a member of our political community. Therefore, he has a presumptive right to bear arms. By infringing on that right, § 922(g)(3) contradicts the plain text of the Second Amendment." *United States v. Daniels*, 77 F.4th 337, 342 (5th Cir. 2023).

Accordingly, the government bears the burden to show that § 922(g)(3) falls within "this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. However, the Fifth Circuit has held that the government failed to meet this burden, at least for marijuana users like Mr. VanOchten. *Daniels*, 77 F.4th at 340.

*Bruen* sets two different standards for analyzing the "Nation's historic tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2130-31. In some cases, the historical inquiry is "fairly straightforward." *Id.* at 2131. "For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a *distinctly similar* historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S.Ct. at 2131 (emphasis added). On the other hand, if a challenged regulation addresses "unprecedented societal concerns or dramatic technological changes," courts need only find a "relevantly similar" regulation in order to restrict Second Amendment rights. *Id.* at 2132.

It is arguable that the "distinctly similar" standard should apply here. Marijuana was well known and abundant in 18th century America. According to Thomas Paine, [h]emp[4] flourishe[d] even to rankness" in this country. Thomas Paine, *Common Sense* (1776), in *The Writings of Thomas Paine* 106 (Moncure Daniel Conway ed. 1894). American newspapers reported on the use of hemp as an intoxicant. *Intoxicating Quality of Hemp*, Charleston Courier, May 20, 1803, at 2; *Extract from Sonnini's Travels in Egypt, Respecting the Use of a Preparation of Hemp, as a Narcotic*, Farmers' Museum, or Literary Gazette, May 26, 1801, at 4. Accordingly, marijuana is not an "unprecedented societal concern" or the product of "dramatic technological changes." And no regulation on marijuana existed in this country until the Marihuana Tax Act of 1937.

But the Court need not reach this question, because even under the more forgiving "relevantly similar" standard, the government cannot show that § 922(g)(3) falls within this Nation's historical tradition of firearm regulation.

The Fifth Circuit determined that "[b]ecause there was little regulation of drugs (related to guns or otherwise) until the late-19th century, intoxication via alcohol is the next-closest comparator." *Daniels*, 77 F.4th at 344–45. "Throughout the colonial period and into the 19th century, Americans drank alcohol—and lots of it." *Id.* at 345. But "[d]espite the prevalence of alcohol and alcohol abuse, neither the government nor amici identif[ied] any restrictions at the Founding that approximate § 922(g)(3)." *Id.* There was

---

[4] The distinction between hemp and marijuana is a modern one—born of selective reproduction. To the Founders, hemp and marijuana were the same.

"no Founding-era law or practice of disarming ordinary citizens for drunkenness, even if that intoxication was routine." *Id.* at 345–46.

The PSR argues that Section 922(g) "is 'relatively similar' to colonial and state laws forbidding people to publicly use or carry firearms while intoxicated." (ECF No. 38, PSR, PageID.218). However, the only regulations regarding guns and alcohol are easily distinguishable from Section 922(g)(3).

In determining whether the modern and historical regulations are "relevantly similar," the Court must consider "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S.Ct. at 2132-33.

Early American regulations on guns and alcohol were different in both purpose and scope from Section 922(g)(3). "The laws that did exist had two primary concerns: (1) the misuse of weapons while intoxicated and (2) the discipline of state militias." *Daniels*, 77 F.4th at 345. Notably, the colonial laws "did not even ban gun possession or carry" while intoxicated. *Id.* at 345-46. Rather, they prohibited only actually firing guns "during bouts of drinking." *Id.*

The statutes also had different purposes. Virginia's statute "was explicitly passed to conserve gunpowder, which was at a premium, and because ill-timed gunshots might be mistaken for a signal that local Indians were attacking." *Id.* at 345. New York's statute—which only applied from December 31 to January 2—was designed to address the damage caused by intoxicated people firing guns as part of the New Year's celebrations. *Id.* at 345-46.

After the Civil War, a few states banned carrying a weapon while intoxicated. But even if those statutes were analogous, they are both too little and too late. "The *Bruen* Court doubted that three colonial-era laws could suffice to show a tradition," so three postbellum statutes are also too few to establish a tradition. *Id.* at 347. Moreover, "[e]ven if the public understanding of the right to bear arms *did* evolve, it could not change the meaning of the Second Amendment, which was fixed when it first applied to the federal government in 1791." *Id.* at 348.

Thus, because "neither Congress nor the states disarmed alcoholics, the group most closely analogous to marihuana users in the 18th and 19th centuries," Section 922(g)(3) is unconstitutional. *Id.* at 354-55. Accordingly, the federal government cannot prohibit Mr. VanOchten from possessing firearms due to his use of marijuana. Because he cannot constitutionally be prohibited from possessing arms, Mr. VanOchten is not a "prohibited person" under the guidelines. Accordingly, his base offense level is 18, pursuant to U.S.S.G. § 2K2.1(a)(5). Mr. VanOchten should then receive a specific offense characteristic for two levels for possessing 3-7 firearms.

## Conclusion

Terrance Wayne VanOchten prays this Honorable Court sentence him sufficiently, but not greater than necessary, to achieve the goals of sentencing. He thanks the Court for its time in considering his circumstances and this case.

Respectfully submitted,

SHARON A. TUREK
Federal Public Defender

Dated: September 19, 2023          /s/ Sean R. Tilton
                                   SEAN R. TILTON
                                   Assistant Federal Public Defender
                                   50 Louis, NW, Suite 300
                                   Grand Rapids, Michigan 49503
                                   (616) 742-7420