UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

TERRENCE WAYNE VANOCHTEN,

        Defendant.
_____/

No. 1:23-cr-29

Hon. Paul L. Maloney
United States District Judge

## GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Vanochten made improvised explosive devices—pipe bombs—in evident preparation for domestic conflict. The government requests the Court impose a guideline sentence in this case, to reflect the seriousness of the offense and deter others from following the defendant's example. In calculating the guidelines, the Court should reject Vanochten's claim that 18 U.S.C. § 922(g)(3), which prohibits drug users from possessing firearms, is unconstitutional. Because Vanochten continues to minimize his culpability and dissemble about his motives, the Court should also deny him credit for acceptance of responsibility.

    1.    <u>Facts and Procedural History</u>:

In August 2022, Kalkaska County Sheriff's deputies were dispatched to Vanochten's residence after neighbors reported he was shooting a firearm from his house. (R. 38: PSR ¶ 13, PageID.197.) Vanochten answered the door with a loaded Glock semiautomatic pistol in his hand. (*Id*.) He admitted he was shooting at crows near his propane tank, using an AR-15 type semiautomatic assault rifle. He had

installed a binary trigger[1] on the weapon, making its rate of fire comparable to a machine gun. (PSR ¶¶ 13, 18.) He later conceded shooting toward his propane tank with that weapon was "not a good choice." (*Id.*)

During the encounter, deputies observed a half-full can of beer and a warm bowl of marijuana in Vanochten's garage. (PSR ¶ 13.) Vanochten failed a field sobriety test (PSR ¶ 13); during which body camera footage captured him telling deputies, "*I* am not the enemy." Vanochten's wife told deputies she had become increasingly concerned about his mental state and extreme views. (PSR ¶ 17). She later turned over audio recordings of Vanochten saying, among other things, that he would "go to war right now" for the men arrested on January 6, 2020. (PSR ¶ 22.) He added that he wanted "true freedom," and that Congresswoman Nancy Pelosi "needs to have her head on a stick." (*Id.*)

Vanochten refused a breathalyzer test, and was arrested for possession of firearms while intoxicated. (PSR ¶ 13.) He also refused consent for a blood draw, which deputies later obtained with a search warrant. (PSR ¶ 14.) His blood alcohol content was determined to be .157, twice the legal limit for driving while intoxicated. (PSR ¶ 21.) During questioning, Vanochten admitted he had five beers before the shooting incident, plus medication for anxiety, and marijuana. He admitted using marijuana about "every three nights." (PSR ¶¶ 18-19.)

---

[1] A binary trigger fires one shot when the trigger is pulled, and another when it is released. Although it does not technically meet the ATF regulatory definition of a "machine gun," it can achieve a similar rate of fire. *See, e.g.* "The Fargo Shooter Used a Binary Trigger," ABC News, July 21, 2023 https://abcnews.go.com/US/wireStory/fargo-shooter-binary-trigger-device-worrying-police-101565917

Deputies returned to Vanochten's house with a search warrant, and found a large cache of semiautomatic weapons, ammunition, and military gear. (PSR ¶ 15.) That included a battle-dress camouflage uniform with embroidered name tapes reading "VANOCHTEN" on one breast, and "U.S. ARMY" on the other, although Vanochten has no history of military service. (PSR ¶ 70.)

Deputies called the Michigan State Police bomb squad after discovering three galvanized metal pipe bombs. The bombs were filled with black powder and drilled for insertion of the fuse cord Vanochten kept in the same ammo can. (PSR ¶ 16.) Vanochten kept related literature nearby, including an Army field manual titled, "Boobytraps," a pamphlet titled, "Defending Your Retreat: A Manual for Combat After the Collapse," and a book titled, "The Militia Battle Manual." The "Militia Battle Manual" contained numerous highlighted passages about constructing and detonating improvised explosive devices.

Deputies returned to Vanochten's house the next day with a second warrant that authorized an expanded search for illegal weapons and destructive devices. Among other things, they recovered an AR-15 platform rifle with an attached 40mm grenade launcher. (PSR ¶ 20.) ATF experts determined the launcher was a destructive device. (PSR ¶ 83.) Vanochten conceded that fact before this Court under oath: "The defendant also acknowledges and agrees that a Hartford Comm USA, Model M203 40mm projectile launcher, serial number U28200801545 seized from his residence on August 17, 2022, constitutes an illegal destructive device as defined by 26 U.S.C. § 5861(d)." (R. 32: Plea Agreement ¶ 6, PageID.158.)

3

In the months following his arrest, Vanochten repeatedly violated court orders, eventually leading to bond revocation and pretrial custody. On November 4, 2022, he returned to his soon-to-be ex-wife's house. (PSR ¶ 45.) She found him dressed in full combat gear, including body armor and a helmet, drunkenly swaying in the back doorway to the garage with a loaded AR-15 rifle by his side. (*Id.*) On November 14, 2022, he let himself into the house again without permission. He admitted knowing he was in violation of a Personal Protection Order, and was taken into custody by Kalkaska County deputies. (*Id.*)

In March 2023, he was taken into federal custody to answer the indictment in this case. He was released on bond conditions that required him to relinquish all firearms and abide by the Kalkaska County PPO. (PSR ¶ 6.)

In April 2023, Vanochten's wife called law enforcement and told them she saw a person she believed was Vanochten outside her home, with night vision goggles and a rifle. (PSR ¶ 7.) She thought he might have been retrieving weapons he had buried on the property, an assumption bolstered by his possession of a book titled "How to Bury Your Goods: The Complete Manual of Long-Term Underground Storage." (*Id*; 1:23-mj-126: Application for Search Warrant, PageID.4.) Law enforcement was unable to locate signs of digging. Vanochten told officers he was with his girlfriend all night, and was adamant that he possessed no firearms or ammunition. (PSR ¶ 8.) Text messages later retrieved from Vanochten's phone disclosed his state of mind at the time: On April 13, 2023, he told his girlfriend that

he believed investigators wanted to kill him. She replied, "Stop, Terry, you're scaring me." (PSR ¶ 24.)

During a home visit on April 19, 2023, Vanochten falsely assured Probation that all firearms, ammunition, and dangerous weapons had been removed from his current residence. (PSR ¶ 9.) The next day, however, ATF executed a search warrant at his home. They found rifle ammunition in the house, and a crossbow and samurai sword in his vehicle. (*Id.*)

At a bond revocation hearing on May 1, 2023, the Court gave Vanochten another chance, but sternly reminded him he was prohibited from possessing weapons or ammunition. (PSR ¶ 10.) When it became apparent that he had violated the terms of his bond yet again, Vanochten's attorney filed a motion to revoke bond on his client's own behalf. (PSR ¶ 11.)

Vanochten now claims he built the bombs for fishing, and not as anti-personnel devices. In support, he expresses newfound certainty about the details:

> These devices were constructed in roughly 1999, with the soul [sic] intention of collecting salmon from the east branch of the Au Gres river. I seen the fish in this area of the river that was rarely fished, the salmon wouldn't bite on conventional tackle since they were spawning. I got the idea from a movie I'd seen years before.

(PSR ¶ 27.)

In his recorded interview with the Kalkaska County Sheriff's Office in 2022, however, Vanochten said:

> Detective Regan Foerster (RF)
> Terry Vanochten (TV)
>
> [29:29]

5

RF: They found some pipe bombs, Terry.

TV: Okay. Yeah, Alright. Yeah, I did, come to think of it. Yeah. Years and years ago.

RF: Can you tell me why they would have found that stuff? I mean, if you're in the garage, just tinkering with guns and stuff, what are we doing?

TV: Yeah, I don't know, sir. No, that, them were from, quite a few years ago. That, I don't know what I was thinking at that time. I can't believe I didn't get rid of that stuff. Yeah, no I, yeah I do, and I know what you're talking about now, there was an ammo can. I think. I had it sealed up in an ammo can, I think.

RF: I don't know what they're in. I don't know what they were in. I just know that they're there.

TV: Well they were kept safe. And I, like I say, I had totally forgot about that.

RF: Why did you have those?

TV: I don't know. I don't know. That was, something years ago, probably blowing up fish or something stupid. Like I say, that, yeah, that was, before I even moved up here, as a matter of fact, I put them together. That was when I was living down in, uh, Turner. Before I even moved here, before I met my wife. So those had been around for a while, yeah.

RF: How long ago was that?

TV: Uh, like twelve years, I guess, probably, so.

RF: Two thousand ten?

TV: Yeah, something like that.

RF: Okay.

TV: Yeah, me and some buddies were messing around. That's, I think, what it was, is, he was blowing up carp in the ditches and stuff and, no, it's stupid. We were messing around with 'em and thinking it's funny, watching the water fly.

6

[31:00]

Vanochten improvised a similar excuse in 2009, when he was convicted of forging a controlled substance prescription. At that time he told Michigan State Police it was a "mistake," and that he "only changed the script to avoid the additional office visit." (PSR ¶ 44.)

2. Guideline Issues:

   a. Constitutionality of 18 U.S.C. § 922(g)(3)

Vanochten objects to the determination that he was prohibited from possessing firearms at the time of the offense because of his illegal drug use. (R. 38: PSR, PageID.215.) That status affects two calculations, adding a total of four levels to his adjusted offense level: First, his base offense level for possession of the destructive device is 20, instead of 18. (PSR ¶ 30; USSG § 2K2.1(a)(4)(B)). Second, it means he possessed all of his firearms illegally, not just the bombs. Because there were more than 8 firearms at his residence, his offense level is increased by two. (PSR ¶ 31; USSG § 2K2.1(b)(1)(B)).

In support of his objection, Vanochten cites *United States v. Daniels*, 77 F.4th 337, 2023 U.S. App. LEXIS 20870 (5th Cir. 2023). In that case, the Fifth Circuit held 18 U.S.C. § 922(g)(3) was unconstitutional as applied to an occasional marijuana user who was not high at the time he possessed the weapon. *Id*, at *33.

First, *Daniels* is not controlling case law in the Sixth Circuit, which never held that § 922(g)(3) is unconstitutional. On the contrary, district courts in this and other circuits have routinely upheld it. See, e.g. *United States v. Overholser*, No.

7

3:22-CR-35 JD, 2023 U.S. Dist. LEXIS 108630, at *3-5 (N.D. Ind. June 23, 2023) (citing cases, rejecting post-*Bruen* challenge.) Second, *Daniels* incorrectly applies Supreme Court precedent. Third, Vanochten's case is distinguishable from *Daniels* because he was high at the time of the offense.

    The Second Amendment provides: "A well-regulated militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." *USCS Const. Amend. 2*. The Amendment guarantees an individual right to possess and carry arms for self-defense. But as the Supreme Court has repeatedly emphasized, "the right secured by the Second Amendment is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626; see *NYSPRA v. Bruen*, 142 S.Ct. 2111, 2128 (2022); *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion).

    In determining the scope of the right to keep and bear arms, a court should consider the right's history and the Nation's tradition of firearms regulation. See *Bruen*, 142 S.Ct. at 2126. History confirms that Congress may disarm persons who are not law-abiding, responsible citizens. Because "[c]onstitutional rights are enshrined within the scope they were understood to have when the people adopted them," a court should also consider evidence of how the Founding generation understood the right. *Bruen*, 142 S.Ct. at 2136. And because evidence of the "public understanding of the legal text in the period after its enactment or ratification" is probative of original meaning a court should consider how the Second Amendment

8

was understood in the 19th century. *Heller*, 554 U.S. at 605; *Bruen*, 142 S.Ct. at 2136-2138.

The understanding that the government could lawfully disarm irresponsible subjects carried from English law through the American revolution, as one episode illustrates: In 1780, London officials reacted to widespread writing by confiscating the rioters' arms. See Joyce Lee Malcolm, *To Keep And Bear Arms: the Origins of an Anglo-American Right* 130-131 (1994). The House of Lords debated—and rejected—a motion declaring that the confiscation violated the English Bill of Rights. See *id*. at 131-132. Members defended the confiscation on the ground that it applied only to the "disorderly" "mob," not to "sober citizens" or "citizens of character."[2]

Colonies and early states punished irresponsible use of arms with forfeiture of the arms. Early American justice-of-the-peace manuals explained that the Statute of Northampton—which the colonies inherited along with other pre-colonial statutes, see *Patterson v. Winn*, 5 Pet. 233, 241 (1831)—empower justices of the peace to confiscate the arms of persons who carried them in a manner that spread fear or terror.[3] Others made forfeiture part of the penalty for offenses such as unsafe storage of guns or gunpowder.[4] Although those laws involved forfeiture of

---

[2] See, e.g., 21 *The Parliamentary History of England, from The Earliest Period to the Year 1803*, at 691 (T.C. Hansard 1814) (speech of Lord Amherst) (June 19, 1780) (defending disarmament of the "mob"); id. at 730-731 (June 21, 1780) (speech of Lord Stormont) (distinguishing "disorderly" persons from "sober citizen[s]").
[3] See, e.g., James Davis, *The Office and Authority of a Justice of Peace* 5 (1774) (N.C.); Joseph Greenleaf, *An Abridgment of Burn's Justice of the Peace and Parish Officer* 12-13 (1773) (Mass.); William Waller Hening, The New Virginia Justice 18 (1795) (Va.); Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* 22- 24 (2d ed. 1792) (N.H.); James Parker, *Conductor Generalis* 12 (1764) (N.J.); James Parker, Conductor Generalis 12 (Robert Hodge printing 1788) (N.Y.); James Parker, *Conductor Generalis* 11 (Robert Campbell printing 1792) (Pa.).
[4] 5 See Act of Mar. 1, 1783, ch. 46, 1782-83 Mass. Acts 120 (1890); Act of Feb. 18, 1794, § 1*, The Laws of the State of New Hampshire* 460 (1815); Ordinance of Oct. 9, 1652, *Laws and Ordinances of New Netherland*, 1638-1674, at 138 (E.B. O'Callaghan ed., 1868); Act of Mar. 15, 1788, ch. 81, § 1, 2 *Laws of the State of New-York*, 95-96 (2d ed.

9

arms involved in an offense, rather than bans on possessing arms, they show that legislatures could restrict an individual's ability to bear arms if his conduct suggested that he would not use them responsibly.

In the 19th century, several states banned the sale of guns to persons of unsound mind.[5] In the Reconstruction era, states forbade intoxicated persons from buying or carrying guns.[6] State courts upheld such laws on the ground that the disqualified individuals were apt to use arms irresponsibly. The Missouri Supreme Court, for example, upheld a ban on carrying arms while intoxicated as a "reasonable regulation" that prevented the "mischief to be apprehended from an intoxicated person going abroad with firearms." *State v. Shelby*, 2 S.W. 468, 469 (1886).

The tradition of disarming unfit persons has continued unabated into the 20th century with, among other things, the Gun Control Act of 1968, Pub L. No. 90-618, §102, 82 Stat. 1220. Even members of the current Supreme Court have recognized that, whatever the outer limits of Congress's power to disqualify categories of persons from possessing arms, Congress may at a minimum disarm "dangerous individuals," *NYSRPA v. City of New York*, 140 S.Ct. 1525, 1541 (2020) (Alito, J., dissenting), or individuals "who have demonstrated a proclivity for

---

1807); Act of Dec. 6, 1783, ch. 1059, § 1, 11 *The Statutes at Large of Pennsylvania from 1682 to 1801,* at 209-210 (1906).
[5] See Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Act of Feb. 17, 1899, ch. 1, § 52, 1899 N.C. Pub. Laws 20-21.
[6] See Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879); Act of Apr. 3, 1883, ch. 329, § 3, 1883 Wis. Sess. Laws, Vol. 1, at 290.

10

violence or whose possession of guns would otherwise threaten the public safety." *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting).

Vanochten suggests that because no one attempted to disarm marijuana users as a class at the Founding, 18 U.S.C. §922(g)(3) is unconstitutional on its face. This is too crabbed a reading of *Bruen*, which requires the government to support gun regulation with a "historical *analogue*, not a historical *twin*." *Bruen*, 142 S.Ct. at 2133. As the Supreme Court held, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id*.

For example, the Second Amendment allows Congress to disarm felons, see *Heller*, 554 U.S. at 626, even though the first federal law disarming felon dates to 1938. The Supreme Court has likewise dismissed as "bordering on the frivolous" the argument that the Amendment protects "only those arms in existence in the 18th century." *Heller*, 554 US at 582. The notion that the amendment permits only those regulations that existed in the 18th century has no more merit. Cf. *McIntyre v. Ohio Elections Commission*, 514 US. 334, 373 (1995) (Scalia, J., dissenting) ("Quite obviously, not every restriction upon expression that did not exist in 1791 or 1868 is *ipso facto* unconstitutional.")

The Fifth Circuit wrongly rejected the analogy between 922(g)(3) and historical prohibitions on intoxicated people bearing arms. *Daniels*, 2023 U.S. App. LEXIS, at *14-18. That court reasoned those laws and § 922(g)(3) "share a common 'why': preventing public harm by individuals who lack self-control and carry deadly

11

weapons. But the 'how' is different" because the "statutes support the banning the *carry* of firearms *while under the influence.*" *Id*. at *18.

The Supreme Court counseled that "[i]f the modern regulation addresses 'a general societal problem that has persisted since the 18th century,' then 'the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment.' But if a modern law addresses 'unprecedented societal concerns or dramatic technological changes,' it calls for a 'more nuanced approach.'" *Bruen*, 142 S.Ct. at 2131.

Vanochten urges this court to require a "distinctly similar" historical antecedent, because marijuana and hemp existed in the 18th century, but Congress did not regulate hemp users' possession of guns. (R. 39: Def's Sent. Memo, PageID.229). As scholars have noted, however:

> [T]he "general societal problems" framework itself places too much weight on historical silence … effectively treating silence as evidence for expansive gun rights. But the absence of evidence of regulation might have had nothing to do with the belief that doing so would have been unconstitutional. May be the Founding generation did not think of a particular solution. Maybe the regulatory means did not exist. Maybe policymakers prioritized other pressing issues like setting up a new government and addressing external and internal threats to its existence.

Joseph Blocher & Eric Ruben, *Originalism-by-Analogy and Second Amendment Adjudication*, 133 Yale L.J. (Forthcoming 2023), electronic copy available at https://ssrn.com/abstract=4408228.

Applying the "distinctly similar" test to Section 922(g)(3) is inappropriate because the combination of modern weaponry and drugs is not a "general societal problem that has persisted since the 18th century." There was no epidemic of gun violence by Colonial hemp users with black powder muskets that the Founders would have bothered to regulate. Dramatic technical changes since then, however, have enabled a shooter with a high-capacity semiautomatic weapon to kill or maim dozens of individuals before even the fastest police can respond. And modern controlled substances can have unprecedented effects, including inducing paranoia and aggression. Even marijuana, when combined with other controlled substances, or used in conjunction with underlying mental health issues, can undermine rational thinking in ways unforeseeable to the Founders.

These unprecedented societal concerns justify taking a "more nuanced approach." Alcohol and flintlocks may not be a "dead ringer" for narcotics and AR-15s, but the nation has a long history and tradition of disarming dangerously irresponsible individuals, and § 922(g)(3) is analogous enough to historical regulations to pass constitutional muster.

Vanochten cites *Daniels* for the proposition that even if Section 922(g)(3) is constitutional on its face, it is unconstitutional as applied to marijuana users. (R. 39: Def. Sent. Memo, PageID.227.) He overstates the holding of *Daniels*, which explicitly provided, "We do not invalidate the statute in all its applications, but, importantly, *only as applied to Daniels.*" *Daniels*, 77 F.4th 337, 2023 U.S. App. LEXIS 20870 (August 9, 2023) at *33.

As courts have long held, "a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." *Kanter v. Barr*, 919 F.3d 437, 450 n. 12 (7th Cir. 2019) (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973)).

Daniels' situation is not before the Court. Unlike Vanochten, he was a "periodic" marijuana user, whom the Fifth Circuit said "while sober, [ ] is like the repeat alcohol user in between periods of drunkenness" whom the Founders would not have disarmed. *Daniels*, 2023 U.S. App. LEXIS 20870 at *23. Vanochten, on the other hand, was high at the time of the offense. Moreover, he admittedly used marijuana in irresponsible conjunction with alcohol and prescription medication.

Vanochten's unsuitability to possess firearms was most clearly demonstrated by his irresponsible behavior on the day of his arrest: He was drunk, high, and shooting at birds with a near-machine gun, in the direction of a propane tank, in a residential neighborhood. If § 922(g)(3) is unconstitutional as applied to anyone, that someone is not Vanochten.

    b. <u>Acceptance of Responsibility</u>:

A defendant who clearly demonstrates acceptance of responsibility for his offense is normally entitled to a reduction in his offense level. USSG § 3E1.1(a). *Id.,* Application Note 1(A). While a timely plea is considered strong evidence of acceptance, a defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right. *Id.,* Application Notes 1, 3; *United States v.*

*Meacham,* 27 F.3d 214, 217 (6th Cir. 1994). A defendant who falsely denies or frivolously contests relevant conduct that the court determines to be true acts in a manner inconsistent with acceptance of responsibility, which may outweigh his entry of a plea. USSG § 3E1.1, Application Notes 1, 3. A defendant may make good-faith legal objections to the PSR without endangering his credit for acceptance. *United States v. Smith,* 127 F.3d 987, 989 (11th Cir. 1997). When the defendant raises frivolous legal arguments or makes false factual objections, however, he may appropriately be denied an adjustment under § 3E1.1. *Id.*

Vanochten entered a timely plea. He continues, however, to minimize the seriousness of his conduct by claiming he built pipe bombs for "fishing." But the bombs were found in an ammunition can, as part of a cache of military equipment and high-powered weapons, near manuals on how to make booby-traps and use explosives as part of a "militia" battle plan.

Vanochten has offered nothing to corroborate his "fishing" story except his own self-serving account. And that story is inconsistent with the version he improvised under pressure during his initial police interview: Then, he expressed a hazy memory that maybe he and unidentified "buddies" were trying to blow up "carp" in "ditches" "for fun," and "to watch the water fly." Now, he says he made the bombs for the sole purpose of "collecting salmon from the east branch of the Au Gres River," because they "wouldn't bite on conventional tackle."

Vanochten says he made the bombs 23 years ago, and forgot about them. In support, he proffers that the brand of black powder found with the pipe bombs is out

15

of current manufacture. That does not rule out the possibility that he recently made the bombs with the old powder, or with different powder. In any event, believing he had forgotten them would require one to also believe he highlighted the "Boobytraps" and "Militia Battle Manual" sections on explosives for some other reason, and forgot *those* 23 years ago as well.

Vanochten similarly claims his weapons hoard was "not as it seem[s]" because he had a benign "life-long hobby" of collecting "military surplus" and memorabilia. (R. 39-1: Def's Letter, PageID.234.) None of the weapons he possessed, however, were actual military collectibles – they were commercial AR-15 platform rifles and semiautomatic pistols, to which he added aftermarket features like a binary trigger to maximize their lethality. Neither was Vanochten's "uniform"—with its self-created name tags and fitted helmet—a "collectible." It was the outward sign of his paranoid obsession. Because Vanochten continues to deceive the Court by minimizing the seriousness of his conduct, he has not earned a reduction for acceptance of responsibility.

  3. <u>Statutory Sentencing Factors</u>:

The Court is required to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the court must consider, among other things:

> a. *The nature and circumstances of the offense and the history and characteristics of the defendant (18 U.S.C. § 3553(a)(1)):*

The nature and circumstances of the offense are what they seem in this case. Vanochten has a history of gainful employment, and minimal criminal history. But

the "current climate in our country today" to which he refers (R. 39-1, PageID.234) is partly driven by individuals with characteristics just like Vanochten's.

The day of his initial arrest, he told Sheriff's deputies he loved law enforcement, and said "*I* am not the enemy," revealing his conviction that other Americans *are* the enemy. He now tries the same pitch on this Court, saying, "I fly the American Flag every day and I love my country … I stand behind our great Military and law enforcement as they are what keeps America so great. I'm proud to be a hardworking patriotic Citizen." (*Id*, PageID.235.) But in recorded conversations with his wife, he actually said:

> I want true freedom, I really do. Nancy Pelosi, she needs to have her head put on a stick. F—ing Schumer, these motherf—ers, you know what I mean? These c—suckers are being put to you for this January 6th s—t? I'd go to war f—ing right now for these men. Right now. This country's a f—ing joke, and I'm tired of it.

Vanochten also attempts to portray himself as a man of deep faith, who can therefore be trusted to keep the peace. (R. 39-1, 2.) But when his wife asked him why he hadn't read the Bible she gave him, he said, "God needs warriors, he don't need people to sit and read the f—ing Bible. He needs people that are gonna go and f—ing change." He added, "I know what Jesus would think of all this. He'd be, think the same thing I do. Spit in their f—ing eye, is what I'd say."

Vanochten might credibly admit to this Court that he had been misled by popular proponents of division. Instead, he dissembles about his motives, suggesting his has not abandoned the ideology that makes him dangerous.

17

> b. *The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense (18 U.S.C. § 3553(a)(2)(A))*
>
> and
>
> c. *The need for the sentence imposed to afford adequate deterrence to criminal conduct (18 U.S.C. § 3553(a)(2)(B))*

While firearms in regular use by law-abiding citizens may have a defensive purpose, there is no such purpose for bombs and improvised explosive devices. They are used against Americans on overseas battlefields, and routinely used by terrorists in lawless countries against their fellow citizens. Even preparation to use these tactics domestically is a serious offense.

Vanochten has shown disrespect for the law by making prohibited destructive devices. But he has also shown disrespect for state and federal courts by repeatedly violating County protective orders, and lying to U.S. Probation and a U.S. Magistrate Judge about his possession of weapons and ammunition. The sentence should (1) reflect the serious nature of the offense; (2) send a message that court orders meant to protect the peace must be obeyed; and, (3) dissuade others tempted by preachers of discord from following Vanochten's example.

For the foregoing reasons, the government requests the Court impose a guideline sentence in this matter.

                                                Respectfully submitted,

                                                MARK A. TOTTEN
                                                United States Attorney

Dated: September 22, 2023           */s/ Nils R. Kessler*
                                                NILS R. KESSLER
                                                Assistant United States Attorney
                                                P.O. Box 208
                                                Grand Rapids, Michigan 49501-0208
                                                (616) 456-2404