```
1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE WESTERN DISTRICT OF MICHIGAN
2                             SOUTHERN DIVISION

3      _____

4      UNITED STATES OF AMERICA,

5                         Plaintiff,

6           v.                           CASE NO:  1:23-CR-29

7      TERRANCE WAYNE VANOCHTEN,

8                         Defendant.

9      _____/

10

11                            *   *   *   *

12                         SENTENCING HEARING

13                            *   *   *   *

14

15     BEFORE:    THE HONORABLE PAUL L. MALONEY
                  United States District Judge
16                Kalamazoo, Michigan
                  September 29, 2023
17
       APPEARANCES:
18
       APPEARING ON BEHALF OF THE PLAINTIFF:
19
              NILS R. KESSLER
20            Assistant United States Attorney
              P.O. Box 208
21            Grand Rapids, Michigan  49501-0208

22     APPEARING ON BEHALF OF THE DEFENDANT:

23            SEAN TILTON
              PEDRO CELIS
24            Federal Public Defender
              50 Louis Street, NW, Suite 300
25            Grand Rapids, Michigan  49503-2633
```

I N D E X

WITNESS                                                    Page

SARA CHOI

        Direct Examination by Mr. Kessler         14
        Cross Examination by Mr. Tilton           28


E X H I B I T S

                                                     Rec'd.

Government's Exhibit 1
        (Video recording)

Government's Exhibit Number 2
        (Photo)

Government's Exhibit Number 3
        (Photo)

Government's Exhibit Number 4
        (Photo)

Government's Exhibit Number 5
        (Photo)

Government's Exhibit Number 6
        (Photo)

Government's Exhibit Number 7
        (Video recording)

Government's Exhibit Number 8
        (Video recording)

|   |   |
|---|---|
| | 1 |

Kalamazoo, Michigan

September 29, 2023

at approximately 2:39 p.m.

PROCEEDINGS

THE COURT:  This is File Number 23-29; <u>The United States of America vs. Terrance Wayne VanOchten</u>.  This matter is before the Court for sentencing.

The Court's file reflects that on June 20, 2023, the defendant pled guilty before this Judge to the offense of possession of unregistered destructive devices, contrary to 26 U.S. Code 5861(d), 5841, and 5871.  The Court accepts the plea agreement in this case finding the charges pled to adequately reflect the seriousness of the actual offense behavior.

There are defense objections to the scoring of the guidelines by the Court's probation office.  The Court's probation office scored this case at Offense Level 23, Criminal History Category I, resulting in an advisory guideline range of 46 to 57 months.

The record should reflect that Assistant United States Attorney Nils Kessler represents the government, Attorney Sean Tilton and Pedro Celis represent the defendant, the defendant is present in person.

Mr. Tilton, have you had ample opportunity, sir, of reviewing the presentence report with your client?

```
 1            MR. TILTON:  Yes, your Honor.

 2            THE COURT:  Is it true that you have no objections

 3    to the report?

 4            MR. TILTON:  Correct, your Honor.

 5            THE COURT:  Do you concur --

 6            MR. TILTON:  Well, the scoring --  We object to the

 7    scoring, but no factual objections.

 8            THE COURT:  All right.  Thank you.  Subject to your

 9    objections, do you concur the advisory guideline range is 46

10    to 57 months?

11            MR. TILTON:  Yes, your Honor.

12            THE COURT:  Thank you.

13            Mr. VanOchten, you've had ample opportunity of

14    reviewing the presentence report with your lawyers?

15            THE DEFENDANT:  Yes, sir.

16            THE COURT:  And are you satisfied with their work

17    and representation of you?

18            THE DEFENDANT:  Yes, sir.

19            THE COURT:  Thank you.

20            Mr. Kessler, do you concur in the advisory

21    guideline range?

22            MR. KESSLER:  I do, your Honor.

23            THE COURT:  Are you moving third level, if I grant

24    acceptance?

25            MR. KESSLER:  If you grant acceptance, yes.
```

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 02:41:48 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 02:42:00 | 10 |

THE COURT:  I recognize your pleadings indicate
that the government's position is the defendant should not
get acceptance, but if I grant acceptance, you're moving
third level?

MR. KESSLER:  Yes, your Honor, because we don't
have any objection to the timing of the plea.

THE COURT:  All right.  Thank you very much.

All right.  Let's deal with the objections.

The Court notes the government's sentencing
memorandum, which is ECF 41; the defendant's sentencing
memorandum, which is ECF 39; a supplement, which is ECF 40;
and the Court has received many letters in this case as
well.  So with that introduction, Mr. Tilton.

MR. TILTON:  Thank you, your Honor.

Your Honor, Mr. Celis is going to handle argument
for the objections to Paragraphs 30 and 31.  As noted in the
defendant's sentencing memorandum, we had originally
objected to Paragraph 32 of the presentence report, but that
objection was withdrawn.

THE COURT:  All right.  Thank you.

Mr. Celis, you may proceed, sir.

MR. CELIS:  Good afternoon.

We will stand mostly on our sentencing memo on this
issue, but I just wanted to respond to a few things in the
government's sentencing memorandum.

1          The government notes that Daniels is not

2     controlling caselaw in this circuit, and said that, you

3     know, on the contrary district courts in this and other

4     circuits have routinely upheld 922(g)(3).  However, the

02:43:09  5   government only cites one district court case for that

6     proposition, and that case is from the Northern District of

7     Indiana.  And the government --  Which is in the Seventh

8     Circuit, not the Sixth Circuit.  And the government notes

9     that that case cites other cases, but if you go through that

02:43:27  10  case, it mostly relies on a prior decision from the same

11    judge.  I did not find any Sixth Circuit cases there.  And

12    if you go to that prior decision, Posey, I likewise did not

13    find any Sixth Circuit cases there.  It's Seventh Circuit

14    cases and then two cases from the Fifth Circuit, one of

02:43:45  15  which is Daniels, which has now been overruled by the Fifth

16    Circuit en banc, it cited the district court decision in

17    Daniels.

18          During my brief search this morning, I found only

19    one case that from -- one district court case from the Sixth

02:44:05  20  Circuit that addresses 922(g)(3) after Bruen.  And that is

21    an opinion that was actually released on this Monday,

22    September 25th.  This case is United States vs. Ketonio

23    Lewis, which is Westlaw 2023, 6225329.

24          THE COURT:  Which district, I'm sorry?

02:44:32  25        MR. CELIS:  That's from the Middle District of

                1    Tennessee.

                2           THE COURT:  Okay.  Go ahead, sir.

                3           MR. CELIS:  And in that opinion, the district court

                4    rejected a facial challenge to 922(g)(3).  However, the

02:44:46        5    Court said that it saw potential merit in an as applied

                6    challenge.  It noted that the defendant in this case was

                7    purportedly a periodic user of marijuana, so it left open an

                8    as applied challenge to be determined after trial so that

                9    all of the facts about the defendant's drug use could come

02:45:04       10    in.

               11           So from my review of the district court cases in

               12    the Sixth Circuit, there is no overwhelming rejection of

               13    this argument.  In fact, the one case I found left open the

               14    possibility for an as applied challenge for a marijuana

02:45:22       15    user.

               16           That was the main addition to our brief that I

               17    wanted put forward.  But if the Court has any questions

               18    about our position, I'm happy to answer them.

               19           THE COURT:  Let me hear from Mr. Kessler, and I'll

02:45:42       20    undoubtedly come back to you.

               21           Go ahead, Mr. Kessler.

               22           MR. KESSLER:  Yes, your Honor.

               23           Just addressing the one thing that my colleague

               24    just brought up, your Honor, he makes a point that the

02:45:51       25    government cites only one district court case in support of

922(g)(3).  I would point out we don't have to present any

cases in support of it.  922(g)(3) is the law of the land

and has been everywhere in America since 1968, so it's

really their burden to come up with some compelling caselaw

02:46:09  that would make you change your mind on that.  The only case

that's out there that's controlling anywhere is Daniels,

which is in the Fifth Circuit, not the Sixth Circuit, as we

pointed out.  As far as I'm aware, the only district courts

that have actually followed that precedent are in the Fifth

02:46:25  Circuit, one of which was a court that ruled that 922(g)(3)

was constitutional and then had to go change its mind

reluctantly because of Daniels.  We are not in the Fifth

Circuit here.

I don't know if you want to hear my whole argument

02:46:37  on this now, your Honor.  I do have some evidence that goes

to other issues having to do with our sentencing memorandum,

but also to do with this, in the sense that Daniels is

distinguishable from this case.  And basically what I would

be intending to show the Court is that Daniels had

02:46:56  potentially an as applied challenge, because he was a

periodic user of marijuana and was sober at the time,

whereas Mr. VanOchten is very different from that.  We

actually have video evidence and there's audio and there is

discussion about -- and I would like the Court to see it,

02:47:10  what he was doing.  He actually was high and drunk at the

1     time he was using a gun in a very unsafe way, which is going

2     to become eminently apparent to the Court when I show the

3     video.

4              Would you like me to put on evidence now or would

02:47:23  5     you like me to do the argument or --

6              THE COURT:  Why don't you go ahead and complete the

7     argument, and then we will view the video and listen to the

8     audio.

9              MR. KESSLER:  Okay, your Honor.

02:47:33  10             So, I already started by talking about the fact

11    that Daniels is not controlling caselaw here.  But even if

12    it were controlling caselaw, I would argue to the Court that

13    Daniels was incorrectly decided.  What the Bruen case said,

14    which is what Daniels purports to interpret, is that a gun

02:47:52  15    regulation has to be consistent with the nation's history

16    and traditions of firearms regulation in order to be upheld.

17    But what the Court actually said in Bruen as well is that we

18    don't have to go back and find an exact match.  So we don't

19    have to go back and find something that is, for example, a

02:48:08  20    colonial era law that says people can't be smoking hemp

21    while possessing flint locks, which would be an exact match

22    in order to uphold (g)(3).  What we need to find, Bruen

23    says, is an analog, so something that is close enough to

24    pass constitutional muster.

02:48:24  25             The Daniels case is wrong because they had this

very narrow reading where they were essentially saying that
if there's a societal problem going back all the way to the
18th century, then you would need to find a very close
match.  Okay.  But we don't have a societal problem like
this going way back to the 18th century.  There was no
epidemic of people running around using hemp and engaged in
mass shootings with flint locks or whatever back then.  What
you had was just what they were dealing with back then, and
what we are dealing with now, which is completely different.
It is an unprecedented societal issue, the control of guns,
and what drugs can do to people now in terms of the
rationality of their thinking, which called for although
more leeway, and _Bruen_ gives the courts more leeway and
gives Congress more leeway in order to regulate new issues,
things that didn't exist in exactly the form back in the
18th century.  That's what we have now, and that's what we
have with Mr. VanOchten, somebody who is very dangerous
because of the combination of modern weaponry that wasn't
available back then, and drugs that are, even if they were
in some sense available back then, in the sense of hemp or
whatever he was bringing up, they weren't being used in the
same way, and in conjunction with mental illness,
prescription drugs and everything else.  So we don't have to
find an exact match.  We have to find an analog.  And what
_Bruen_ gives Congress the leeway to do is to take a look at

it and say, would it be consistent with the nation's history and tradition to disarm dangerous people.  That's --  We should broaden it out that much.  And I think that's what the Supreme Court is probably going to come down saying after they review -- finish reviewing the Rahimi case, which I'm sure the Court is aware of.  It's another 922(g) case that has been briefed and is going before the Supreme Court for oral argument in November.

We have to have enough leeway and Congress has to have enough leeway to be able to deal with this modern problem.  So I don't think Daniels is correctly decided. But even if it were correctly decided, and this would be the third prong of our argument, Daniels is distinguishable from this case.  So Daniels, and I'm not sure the name of this case that my colleague just brought up here, but what they have in common is that those are as applied challenges to the situation of one unique individual.  And I pointed this out in my brief, but I think Daniels in particular is inapposite to our case here.  They overstate it a little bit by saying that Daniels had found that 922(g)(3) is not applicable to marijuana users.  That's not what it said. The case said it was inapplicable as applied to Daniels, because Daniels was this periodic marijuana user, who was sober at the time he possessed the firearms in question. That is not what we had in this case.  As the Court will see

1    when I put on the evidence, we have a defendant here who was

2    drunk and high at the time that he was shooting in the

3    direction of a propane tank in a residential neighborhood

4    with an AR-15 that he had modified with a binary trigger

02:51:28   5    making it almost a machine gun.  That is the essence of

6    dangerousness that the founding fathers would have been

7    okay, and I think everybody from then until now would be

8    okay with giving Congress the power to regulate.  That is

9    essentially taking guns away from dangerous people.

02:51:46  10         So that's our argument as to that particular issue.

11   I don't know if you want me to go on or --

12         THE COURT:  All right.  Well, why don't we play the

13   evidentiary material that you wish me to view, and then we

14   will take it from there.

02:51:59  15         MR. KESSLER:  Okay.  I can do it one of two ways.

16   If we don't have any contest to it, I can just show the

17   videos.  It's a video that's five minutes long that's a

18   compilation that is Mr. VanOchten, so it's kind of self

19   authenticating as are two shorter audio clips and some

02:52:16  20   photographs.  And I can narrate it or I can call the agent

21   to narrate it.

22         THE COURT:  What is your preference?

23         MR. TILTON:  Well, I guess this is the first time

24   I'm hearing it's a compilation.  So it's not the actual

02:52:29  25   video that was provided during discovery?

1          MR. KESSLER:  No, no, no.  Well, let me clarify.

2     Maybe I should just do it through the agent.  But it's an

3     hour long, and I just took parts of it, rather than show

4     long stretches of nothing pertinent to this hearing.

02:52:45  5          It's --  You've seen the entire thing, to answer

6     your question.

7          MR. TILTON:  I haven't seen it in this form, so

8     that's my only concern, is that I could've watched the five

9     minute compilation ahead of time and had a position on it,

02:53:01 10   now I don't know what it is.

11          THE COURT:  Well, let's do it this way.  Let's take

12    what the government wishes to show, and Mr. Tilton, if you

13    have an objection regarding the fact that it's not -- Rule

14    of Completeness, I guess would be the best way to describe

02:53:17 15   it.  If you believe that more of the video needs to be

16    shown, then we may have to take a five yard penalty for

17    delay of game and come back on another day.

18          MR. TILTON:  Thank you, your Honor.

19          THE COURT:  Okay.

02:53:34 20          MR. KESSLER:  The government calls Special Agent

21    Sara Choi of the ATF.

22          THE COURT:  Agent, please step forward and be

23    sworn.

24                    SARA CHOI,

02:53:41 25   was thereupon called as a witness herein, and after having

1   been first duly sworn to tell the truth, the whole truth and

2   nothing but the truth, was examined and testified as

3   follows:

4           COURT CLERK:  State your full name and spell your

02:53:54   5   last name for record, please.

6           THE WITNESS:  Sara Choi, S-a-r-a, C-h-o-i.

7                   DIRECT EXAMINATION

8   BY MR. KESSLER:

9   Q.   Good afternoon, Agent Choi.

02:54:06   10   A.   Good afternoon.

11   Q.   And if I can ask you to tell us a little bit about your

12   background.  How long have you been an agent with ATF?

13   A.   I've been with the ATF since March of 2020.  Prior to

14   that, I was a law enforcement officer for about 13 years.

02:54:17   15   Q.   Okay.  And you are stationed here in the Grand Rapids

16   resident agency?

17   A.   Yes, I am.

18   Q.   Are you the one who, on the federal side at least,

19   investigated the case involving Mr. VanOchten?

02:54:27   20   A.   Yes, I did.

21   Q.   I would like to take you back to August of 2002 (sic.

22   2022).  How did you first get involved in this case?

23           MR. TILTON:  Not 2002, but 2022.

24           THE WITNESS:  Kalkaska County Sheriff's Office

02:54:37   25   contacted me, and alerted me that they had found pipe bombs

| | | |
|---|---|---|
| | 1 | at Mr. VanOchten's residence. |
| | 2 | BY MR. KESSLER: |
| | 3 | Q.   And that would fall within the purview of the ATF? |
| | 4 | |
| 02:54:48 | 5 | A.   It would. |
| | 6 | Q.   So let's go back specifically to August 17, 2022.  Why |
| | 7 | were deputies dispatched there in the first place? |
| | 8 | A.   They had a report of a subject firing a firearm in an |
| | 9 | unsafe manner. |
| 02:55:02 | 10 | Q.   Okay.  And the sheriff's deputies who went out to Mr. |
| | 11 | VanOchten's residence, were they wearing body-worn cameras? |
| | 12 | A.   Yes, they were. |
| | 13 | Q.   Have you actually watched the entire video from that |
| | 14 | encounter? |
| 02:55:12 | 15 | A.   Yes, I have. |
| | 16 | Q.   It's well over an hour long; is that correct? |
| | 17 | A.   It is. |
| | 18 | Q.   Have you watched the shorter five minute compilation |
| | 19 | that I put together for this hearing? |
| 02:55:21 | 20 | A.   I have, yep. |
| | 21 | Q.   Was it altered in any way, other than it being edited |
| | 22 | down just for length? |
| | 23 | A.   That's correct, yes. |
| | 24 | Q.   Okay.  Correct that it has not been altered -- |
| 02:55:31 | 25 | A.   Yes. |

```
 1    Q.   -- in any other way?
 2              MR. KESSLER:  Okay.  I would like to go ahead and
 3    play it then, your Honor.
 4              THE COURT:  All right, thank you.  Go ahead.
 5              MR. KESSLER:  For the record, this would be
 6    Government Exhibit 1.
 7         (Playing Government's Exhibit Number 1.)
 8    BY MR. KESSLER:
 9    Q.   Did he just say what he was shooting at?  Were you able
10    to hear that?
11    A.   He said crows.
12         (Continued playing Government's Exhibit Number 1.)
13    BY MR. KESSLER:
14    Q.   And what did he just say about don't hit what?
15    A.   The propane tank.
16         (Continued playing Government's Exhibit Number 1.)
17    BY MR. KESSLER:
18    Q.   Agent Choi, we just saw a pistol there with an extended
19    magazine.  Did you recognize that?
20    A.   Yes, I did.
21    Q.   What was Mr. VanOchten doing with that gun when the
22    sheriff deputies arrived?
23    A.   He had it in his hand.
24    Q.   Is that the one we heard him earlier -- the deputies
25    earlier telling him to please put that gun down twice?
```

02:55:39  5

02:56:58  10

02:57:09  15

03:00:41  20

03:00:49  25

```
 1    A.    Yes, it is.

 2          (Continued playing Government's Exhibit Number 1.)

 3    BY MR. KESSLER:

 4    Q.    I just want to make sure the Court can hear that.

 5          Were you able to hear that, Agent Choi?

 6    A.    Yes.

 7    Q.    What did she say?

 8          First off, who was that?

 9    A.    I'm sorry?

10    Q.    Who was that?

11    A.    That was his -- well, now ex-wife, Sandra.

12    Q.    And what did she say?

13    A.    She said that he drinks and then he smokes pot and does

14    it at the same time.

15    Q.    Shooting the gun?

16    A.    Correct.

17          (Continued playing Government's Exhibit Number 1.)

18    BY MR. KESSLER:

19    Q.    All right.  Now Agent Choi, we just heard the deputy

20    say --  They entered a room that appeared to be filled with

21    military gear and weapons, correct?

22    A.    Correct.

23    Q.    And he said we need to call Ashley and get an SW.

24          I'm sorry.

25          What would an SW be?
```

03:01:29  5
03:01:34  10
03:01:43  15
03:02:17  20
03:02:30  25

|        |    |                                                             |
|--------|----|-------------------------------------------------------------|
|        | 1  | A.    A search warrant.                                     |
|        | 2  | Q.    Did the deputies actually go and get a search warrant |
|        | 3  | that day?                                                   |
|        | 4  | A.    They did.                                             |
| 03:02:36 | 5 | Q.    So, let's take a closer look at what we saw in that |
|        | 6  | room.  And I'm going to bring up Government Exhibit 2.  Have |
|        | 7  | you seen this before?                                       |
|        | 8  | A.    I have.                                               |
|        | 9  | Q.    Is that a photograph of the room that they entered?   |
| 03:02:48 | 10 | A.    Yes, it is.                                          |
|        | 11 | Q.    What are we looking at here?                          |
|        | 12 | A.    There is a large amount of firearms, ammunition,      |
|        | 13 | military gear.                                              |
|        | 14 | Q.    So this one, for example, this one -- at least these  |
| 03:03:02 | 15 | two are AR-15 platform semiautomatic rifles, correct?     |
|        | 16 | A.    Correct.                                              |
|        | 17 | Q.    This is a semiautomatic tactical shotgun?             |
|        | 18 | A.    It is.                                                |
|        | 19 | Q.    I want to focus on this here.  There is a patch on here |
| 03:03:16 | 20 | it has name tapes that say "U.S. Army" and "VanOchten" on  |
|        | 21 | one of the rifles?                                          |
|        | 22 | A.    That is correct.                                      |
|        | 23 | Q.    Were you able to check and find out whether Mr.       |
|        | 24 | VanOchten ever actually served in the military?            |
| 03:03:26 | 25 | A.    He did not.                                          |

1  Q.   Now, one of the guns have something particular modified

2  on it, correct?

3  A.   Correct.

4  Q.   Can you tell us about that.

03:03:38  5  A.   One of the rifles had a binary trigger assembly.

6  That's something that's aftermarket installed, which Mr.

7  VanOchten said that he had done himself.  The binary trigger

8  is a trigger system that fires when you pull the trigger and

9  again when you release it.

03:03:58  10  Q.   So it fires twice as fast as a normal AR-15?

11  A.   Correct.

12  Q.   Okay.  Is the rate of fire from something like that

13  comparable to a machine gun?

14  A.   It could be comparable, correct.

03:04:06  15  Q.   One other thing, Mr. VanOchten has argued in his

16  sentencing memorandum, that the reason for all of this is

17  that his hobby is that he is a collector of military relics

18  and curios?

19  A.   Uh-huh.

03:04:19  20  Q.   Are any of these things actual military firearms?

21  A.   Not to my knowledge, no.

22  Q.   Are they all aftermarket -- bought on the commercial

23  market or modified?

24  A.   Correct.

03:04:27  25  Q.   Now, let's focus on the bomb itself, because we had

1    some discussion on another topic here about what he was

2    using the bombs for.  So I'm going to bring up Government

3    Exhibit 3.  Do you recognize this ammunition can?

4    A.    I do.

03:04:45  5    Q.    What do we see in the can?

6    A.    I see hobby fuse, I see metal pipe sections, threaded

7    end caps, and a black powder cannister.

8    Q.    Okay.  Let me ask you about a couple of those things.

9    First off, the hobby fuse.  What would that be used for?

03:05:01  10    A.    To initiate a device.

11    Q.    Okay.  And that was found in there with the bomb?

12    A.    Yes.

13    Q.    There were three bombs, correct?

14    A.    There were three.

03:05:10  15    Q.    And the powder, Mr. VanOchten is making an argument

16    about the age of the powder having something to do with what

17    he wanted to use it for.  As an ATF agent, can you tell us

18    if there's anything about the age of powder we should know?

19    A.    The black powder is known to be very stable, shelf

03:05:29  20    stable.  I mean it can still act as it's designed for

21    several, several years.

22    Q.    Okay.  So you could have that black powder for a long

23    time and still explode things with it years later?

24    A.    Yes.

03:05:41  25    Q.    Let me bring up the next exhibit, Number 4.  What are

1    we looking at here?  Is this an evidence bag around it?

2    A.    Yes, it is.

3    Q.    Is that the same device or one of the three devices

4    that was found in that box?

5    A.    Yes, it is, and it's been rendered safe, so it wasn't

6    --  How you're seeing it now is not how it was found in the

7    house.

8    Q.    Okay.  What function does the metal piping and the

9    metal end caps serve in making an explosive device like

10   this?

11   A.    It confines the powder and allows it to explode.  Black

12   powder is a low explosive, so it wouldn't detonate on its

13   own.  It needs to be confined in order to do that.

14   Q.    When the device actually explodes, what does the metal

15   turn into?

16   A.    Shrapnel.

17   Q.    In an improvised explosive device, what is the purpose

18   of shrapnel?

19   A.    Anti personnel, to kill or maim.

20   Q.    Let's take a look at Exhibit 5.  We saw some hobby fuse

21   in the box.  Mr. VanOchten said that box was there for 20

22   years or something like that.

23        What do we see in the middle of this photograph in

24   a different bag, this?

25   A.    Additional hobby fuse.

1   Q.   That's not the same hobby fuse that was in the box,

2   correct?

3   A.   No.

4   Q.   Did ATF find it in this form?

03:07:00   5   A.   Yes.

6   Q.   What is tannerite?

7   A.   Tannerite is an exploding target.  It's a brand.

8   Tannerite itself is a brand of exploding target a binary

9   explosive.  It has a fuel and oxidizer, typically it's

03:07:16   10   imodium nitrate as the oxidizer, and aluminum powder as the

11   fuel.  They are stable when separate, but the idea of the

12   binary explosive is that when those two are mixed, they

13   become an explosive.

14   Q.   In your experience as an ATF agent, have you come

03:07:30   15   across tannerite in connection with black powder in

16   improvised explosive devices?

17   A.   I have heard of it, yes.

18   Q.   What is the purpose of putting those things together?

19   A.   Just to boost the power, I suppose, or the sensitivity.

03:07:44   20   Q.   And tannerite, was that also not found in the same box

21   with the three pipe bombs?

22   A.   Say that again, I'm sorry.

23   Q.   Was the tannerite also found separate from the box

24   containing the three pipe bombs?

03:07:56   25   A.   Found separate from?

```
 1   Q.   Right.  It wasn't in the box with the pipe bomb?

 2   A.   Oh, no.

 3   Q.   Let's bring up Exhibit 6.

 4        Did you find some books and literature in the same

 5   room with the pipe bombs?

 6   A.   I did.

 7   Q.   So this one says, "Booby traps:  Department of the Army

 8   Field Manual," so that one was in there?

 9   A.   It was.

10   Q.   Go to the next page, what does this one say?

11   A.   "Gorilla Warfare" and "Special Forces Operations."

12   Q.   And this page.  What is this one called?

13   A.   "Militia Battle Manual."

14   Q.   Did you leaf through these?

15   A.   I did.

16   Q.   And I'm going to show one or two pages from this

17   Militia Battle Manual.  Were there parts of it that were

18   highlighted?

19   A.   There was.

20   Q.   This one that's highlighted says, "aluminum bronzing

21   powder" has a mark next to the header.  What is the header

22   there of that chapter?

23   A.   Fertilizer and aluminum explosives.

24   Q.   What are fertilizer and aluminum explosives used for?

25   Are you familiar with anything like that?
```

03:08:09 — line 5
03:08:19 — line 10
03:08:33 — line 15
03:08:41 — line 20
03:08:57 — line 25

```
 1    A.    It would be similar to imodium nitrate and aluminum

 2    powder.

 3    Q.    What was used to take down the Edward Murrah Federal

 4    Building in Oklahoma City?

 5    A.    Aluminum powder and imodium nitrate.

 6    Q.    And then we see more highlighting here under something

 7    called "expedient blasting caps."  Are blasting caps used in

 8    improvised explosive devices as well?

 9    A.    We can -- improvised blasting caps, yes.

10    Q.    This last page says "fuses," and it has a picture of

11    somebody using det cord with explosives.  What is det cord?

12    A.    That's used to detonate a device that has a high

13    explosive contained in it.

14    Q.    These are also used in anti-personnel devices?

15    A.    They are.

16    Q.    So the defendant was arrested at the scene this day,

17    correct?

18    A.    He was.

19    Q.    And was he taken to the Kalkaska County Sheriff's

20    Office?

21    A.    Yes, he was.

22    Q.    And who is Detective Regan Foerster?

23    A.    He's a detective with Kalkaska County Sheriff's Office.

24    Q.    Did he question the defendant after Miranda advisement?

25    A.    Yes, he did.
```

             1    Q.   Was that recorded?

             2    A.   It was.

             3    Q.   Okay.  Have you listened to that whole recording?

             4    A.   I have.

03:10:05     5    Q.   All right.  And I've already transcribed it in our

             6    sentencing memo here, but there is a brief section of it

             7    that deals with Mr. VanOchten's explanation for why he had

             8    the devices.  Have you listened to that excerpt?

             9    A.   Yes, I have.

03:10:18    10    Q.   Has it been changed in any way, other than being

            11    excerpted from that long interview?

            12    A.   No, it hasn't.

            13         MR. KESSLER:  I would like to play that, your

            14    Honor.

03:10:25    15         THE COURT:  Proceed.

            16         MR. KESSLER:  Exhibit 7.

            17      (Playing Government's Exhibit Number Exhibit 7.)

            18         MR. KESSLER:  That's the end of that.

            19    BY MR. KESSLER:

03:12:18    20    Q.   Just one question on that, too.  We heard him saying

            21    they were kept safe?

            22    A.   Uh-huh.

            23    Q.   Is an anti-personnel device like that safe if you put

            24    it in an ammo can?

03:12:29    25    A.   Absolutely not.

```
 1   Q.   Have you interviewed the defendant's ex-wife, Sandra

 2   VanOchten?

 3   A.   Yes.

 4   Q.   And are you aware whether she recorded him on her phone

 5   on occasion?

 6   A.   She did.

 7   Q.   And were some of those recordings turned over to you?

 8   A.   Yes, they were.

 9   Q.   Have you listened to those?

10   A.   Yes, I have.

11          MR. KESSLER:  I would like to play Government

12   Exhibit 8.  This just goes to 3553 factors.

13       (Playing Government's Exhibit Number 8.)

14   BY MR. KESSLER:

15   Q.   I just want to make sure it's clear what he said at the

16   end there.  What did he say about what God needs?

17   A.   God needs warriors.

18   Q.   Now, are you also aware that Mrs. VanOchten had taken

19   out personal protection orders against the defendant in

20   Kalkaska County?

21   A.   Yes.

22   Q.   And it's in the record that he went back there anyway,

23   correct?

24   A.   That is correct.

25   Q.   Was arrested, there were two occasions?
```

A.    Yes.

Q.    And on one of those occasions, did Ms. VanOchten video record what he did when he went into the house?

A.    Yes, she did.

03:14:22   Q.    Have you seen that video?

A.    I have.

MR. KESSLER:  I would like to play that, your Honor, and that will be the end.

THE COURT:  Okay.

03:14:32   MR. KESSLER:  I have to play this on a slightly different thing because it won't work on this.

(Playing video exhibit.)

BY MR. KESSLER:

Q.    And this was at Mrs. VanOchten's house after he had

03:15:17   been given a protection order saying he couldn't go to that house; is that correct?

A.    That is correct.

MR. KESSLER:  That's all I have, your Honor.

THE COURT:  Counsel, you may inquire.

03:15:31   MR. TILTON:  Do you have copies of the pictures for me?

MR. KESSLER:  Sure.  And I can pull them up too, if you want.

Your Honor, would you like me to give you hard

03:15:53   copies of the photos as well?  I just gave copies to Mr.

1    Tilton.

2              THE COURT:   That would be fine.   Thank you.

3                        CROSS EXAMINATION

4    BY MR. TILTON:

03:16:00  5    Q.   Good afternoon, Agent Choi.

6    A.   Good afternoon.

7    Q.   Are the video compilation that was Exhibit 1, you've

8    previously viewed that?

9    A.   Yes, I have.

03:16:08  10   Q.   When did you do that?

11   A.   Today.

12   Q.   When did you first become involved in this case?

13   A.   I was called on the day that deputies encountered Mr.

14   VanOchten, first encountered him, when they found the pipe

03:16:36  15   bombs, I believe that was August 17th.

16   Q.   Of, 2022?

17   A.   Yes, sir.

18   Q.   And the second search happened in August of 2022, as

19   well?

03:16:47  20   A.   It did.

21   Q.   And we heard a recording of -- just the audio recording

22   of the interview with Mr. VanOchten?

23   A.   Yes.

24   Q.   And that was in August of 2022?

03:16:57  25   A.   It was.

```
            1    Q.    That was in August -- on August 18th of 2022?

            2    A.    That sounds correct.

            3    Q.    And that was the first time that Mr. VanOchten was

            4    confronted about the pipe bombs?

03:17:09    5    A.    That is correct.

            6    Q.    And he was asked about them sort of generally, right?

            7    A.    Sure, yes.

            8    Q.    And the officer who was inquiring didn't know how the

            9    pipe bombs were found?

03:17:24   10          Let me rephrase that question?

           11    A.    Sure.

           12    Q.    Mr. VanOchten volunteered that the pipe bombs were in

           13    an ammo can, correct?

           14    A.    He did in the interview, yes.  I'm not sure if there

03:17:39   15    was a conversation between deputies and the detective prior

           16    to, I'm not sure.

           17    Q.    What I'm concerned about is the conversation with Mr.

           18    VanOchten.

           19    A.    Okay.

03:17:48   20    Q.    And Mr. VanOchten volunteered that the pipe bombs were

           21    in the ammo can?

           22    A.    Yes.

           23    Q.    And the deputy said that he wasn't sure where they

           24    were?

03:17:56   25    A.    Okay.  Yes.
```

```
 1    Q.    And Mr. VanOchten said that he constructed the pipe
 2    bombs to blow up fish years ago; is that correct?
 3    A.    Yes.
 4    Q.    And between Mr. VanOchten and the deputy, they
 5    estimated that was around 2010?
 6    A.    Yes.
 7    Q.    Did you ever investigate the age of the black powder?
 8    A.    I did not.
 9    Q.    Did you ever look at the defendant's sentencing
10    memorandum where we reached out to the manufacturer of the
11    black powder?
12    A.    I did not.
13    Q.    Did you ever attempt to contact the manufacturer of the
14    black powder?
15    A.    No, I  --   At the time, I didn't see the relevance.
16    Black powder, like I said earlier, is very stable, and you
17    can make a new bomb out of old black powder.
18    Q.    That black powder could have been in that cannister
19    since 2010?
20    A.    Could have been, sure.
21    Q.    An ammunition cannister is a dry place typically if
22    it's closed correctly?
23    A.    Correct.
24    Q.    Now, exhibits -- these are all the --  I'm going to ask
25    you about all of the photographs.
```

03:18:15   5
03:18:29   10
03:18:37   15
03:18:52   20
03:19:09   25

1    A.    Sure.

2    Q.    Looks like it's Exhibits 2, 3, 4, 5, 6, all of these

3    photographs, approximately when were they taken?

4    A.    It would have been in the --  Well, can you show me

03:19:29   5    some of the photographs?

6    Q.    Sure.

7    A.    Just so I can --

8              MR. TILTON:  May I approach, your Honor?

9              THE COURT:  Yes.

03:19:36   10             THE WITNESS:  These ones should all be the ones

11   from either the first search warrant or the second search

12   warrant, which would have been August 17th, 18th, 19th

13   range.

14   BY MR. TILTON:

03:19:48   15   Q.    Of 2022?

16   A.    Yes, sir.

17   Q.    And all of the interviews -- the videos that we saw

18   today, those were all from -- some were from August, 2022,

19   right?

03:19:59   20   A.    Correct.

21   Q.    Some were from November of 2022?

22   A.    Some of them, yes.

23   Q.    Okay.  But you had them all by the time that Mr.

24   VanOchten was indicted in this case, correct?

03:20:11   25   A.    I believe so, yes.

|  |  |  |
|---|---|---|
|  | 1 | Q.   And you had provided those to Mr. Kessler? |
|  | 2 | A.   Yes. |
|  | 3 | Q.   And you had all of that evidence in June of this year |
|  | 4 | when Mr. VanOchten pled guilty? |
| 03:20:22 | 5 | A.   Yes. |
|  | 6 | Q.   You were aware that his -- that what he said about when |
|  | 7 | the pipe bombs and the purpose of the pipe bombs for the |
|  | 8 | creation was to blow up fish, correct? |
|  | 9 | A.   Yes. |
| 03:20:53 | 10 | Q.   And you discussed that with Mr. Kessler? |
|  | 11 | A.   Which part? |
|  | 12 | Q.   About --  Strike that. |
|  | 13 |      MR. TILTON:  I don't have any additional questions, |
|  | 14 | your Honor. |
| 03:21:02 | 15 |      THE COURT:  All right.  Thank you. |
|  | 16 |      Any redirect, Mr. Kessler? |
|  | 17 |      MR. KESSLER:  No, your Honor. |
|  | 18 |      THE COURT:  All right.  Thank you. |
|  | 19 |      You may step down, Agent. |
| 03:21:07 | 20 |      THE WITNESS:  Thank you. |
|  | 21 |    (At 3:21 p.m., witness excused.) |
|  | 22 |      THE COURT:  Mr. Kessler, had you completed your |
|  | 23 | argument at this point in time, on the Bruen related issue? |
|  | 24 |      MR. KESSLER:  On the Bruen related issue, yes, your |
| 03:21:24 | 25 | Honor. |

1          THE COURT:  All right.  Thank you.

2          Mr. Celis, go ahead, sir, if you have anything

3    further on that issue.

4          MR. CELIS:  Just a few additional points responding

03:21:39  5    to the government's arguments.

6          The government says that 922(g) is the law of the

7    land.  Well, the Constitution is the supreme law of the

8    land, and Bruen tells us that when there is a Constitutional

9    challenge under the Second Amendment, it's the government's

03:21:54 10    burden to prove the history and tradition.

11          I would like to note that in this --  I would like

12    to note that the Daniels case did, in fact, apply the lower

13    standard from Bruen.  We noted in our brief that arguably it

14    could have required that distinctly similar regulation based

03:22:15 15    on the fact that hemp has been around since the founding,

16    but Daniels went ahead and applied the lower standards of

17    scrutiny, and they were just looking for a relevantly

18    similar historical analog.

19          The government's argument that essentially the

03:22:36 20    Second Amendment allows regulation of dangerous people does

21    not comply with Bruen.  Bruen gave us a very specific test

22    where we have to look at how and why regulations apply.  For

23    the reasons in our argument, just saying it can regulate

24    dangerous people, is not enough.  We pointed out that the

03:23:06 25    way so-called dangerous people were regulated was different.

1    There is a difference between saying you can't fire weapons

2    while you're intoxicated, and saying you cannot possess

3    weapons at all if you're a habitual user, even if you're

4    sober at the time.

03:23:28    5        The dangerous people standard that the government

6    is proposing, that is essentially a return to the scrutiny

7    that was applied before Bruen where we are looking at

8    whether a regulation makes sense essentially.  Bruen changed

9    that analysis and told us how important it is to look at the

03:23:51   10    historic tradition.

11        I would also like to point out that marijuana usage

12    in this case and in Daniels are virtually identical.  In

13    Daniels, the defendant said that he used marijuana

14    approximately 14 days a month.  Mr. VanOchten said that he

03:24:12   15    used marijuana approximately three days a week, which is a

16    slightly lower rate than 14 days a month.

17        THE COURT:  What do you make of your client's

18    status at the time that the officers were there in terms of

19    his consumption of alcohol and how that impacts the analysis

03:24:37   20    here?

21        MR. CELIS:  I don't believe the consumption of

22    alcohol makes a difference, your Honor.  He is not being,

23    you know, if this were an enhancement for using or

24    possessing a weapon while intoxicated, that would be

03:24:51   25    relevant.  But the question is, is he prohibited person

1    under federal law based on the fact that he uses marijuana?

2    So the fact that he was drunk at the time, I don't believe

3    is relevant.

4         And I would like to point out that the PSR notes

03:25:08  5    that a blood sample was drawn from Mr. VanOchten pursuant to

6    a warrant, and the laboratory tests revealed his blood

7    alcohol level, but it did not find any marijuana, any THC.

8    I don't know if it was tested for that, but there is no

9    result indicating any THC in his blood at the time.

03:25:28  10         THE COURT:  Refresh my memory, what did the test

11    come back on his BAL?

12         MR. KESSLER:  187, your Honor.

13         MR. CELIS:  I have .578, which is Paragraph 21 of

14    the PSR.  Sorry, .157, yes.

03:25:49  15         THE COURT:  A .5 would be fatal.

16         MR. CELIS:  Yes.

17         THE COURT:  I think.

18         Okay.  So under the OUIL statute in the State of

19    Michigan, that's nearly, for purposes of a label, almost

03:26:07  20    double drunk.

21         MR. CELIS:  Yes, your Honor.

22         But like I said, I don't believe it's relevant.

23    The test isn't, you know, do we look at generally whether he

24    is a dangerous person, and then if he is, it doesn't matter,

03:26:21  25    you know, what the particular statute is.  We are asking, is

he a prohibited person?  Is he the equivalent of a felon in

possession.  And that is strictly based on his usage of

marijuana.  And under the statute, being intoxicated under

controlled substance doesn't make you a prohibited person.

You have to be a habitual user or an addict in order to be a

prohibited person.

          THE COURT:  What impact of the case presently set

for argument before the Supreme Court, what impact, if any,

would that decision have on this case?

          MR. CELIS:  It's hard to say, your Honor.  It could

impact it, it could not impact it.  It would really depend

on -- I mean, one, the result of the case, you know,

affirmed or reversal, but two, the grounds that the Court

used to reach its decision.  It's based on a different

statute, so I could see it having an impact.  I could see it

not having an impact.

          THE COURT:  Well, presumably it would further --

further explain the analysis of Bruen as it relates to yet

another provision of 922, correct?

          MR. TILTON:  Yes, it would certainly be another

example of the historical analysis that the Court conducts.

It may shed some light on who are members of the people

under the Second Amendment.

          THE COURT:  All right.  Thank you.

          What is the status of Daniels now in the circuit?

```
 1              MR. CELIS:  I believe --  I'm not sure.  I'll defer
 2    to the government.
 3              MR. KESSLER:  Where it's at right now --  Can you
 4    hear me, your Honor?
03:28:11  5     THE COURT:  Yes.
 6              MR. KESSLER:  So, Daniels right now, the Fifth
 7    Circuit ruled that 922(g)(3) was unconstitutional as to
 8    Daniels, and the U.S. Attorney's Office there had asked for
 9    some additional time to go to the solicitor general and see
03:28:30 10   whether or not they wanted to ask for a rehearing.  That
11    deadline has passed, so I think at this point they would be
12    deciding whether or not to file for cert in the Supreme
13    Court.  I don't know whether they are going to.
14              THE COURT:  So, Daniels stands as adjudicated,
03:28:47 15   subject to the government's decision by the solicitor
16    general, whether a cert petition will be filed?
17              MR. KESSLER:  Correct.  They are not going to file
18    for rehearing, they have decided not to do that.  So it's
19    just whether or not they will file for cert in the Supreme
03:29:01 20   Court.
21              THE COURT:  Do we have any idea what the time line
22    on that is?
23              MR. KESSLER:  I do not, your Honor.  I think it
24    might be 60 days, but I couldn't tell you off the top of my
03:29:10 25   head.
```

1          THE COURT:  All right.  Thank you.

2          Mr. Celis, anything further?

3          MR. CELIS:  No, your Honor.

4          THE COURT:  Go ahead, Mr. Tilton.

03:29:17   5          MR. TILTON:  Your Honor, I believe the government's

6     evidence, at least related to acceptance of responsibility

7     -- do you want to hear on that or want to hear on that or do

8     ou want to hear that as part of allocution?

9          MR. KESSLER:  Can I just briefly --

03:29:31  10          THE COURT:  Yes.  I think acceptance is a subject

11     matter of allocution at the time.

12          So, Mr. Kessler, go ahead if you have anything

13     further on the Bruen issue.

14          MR. KESSLER:  Just very briefly, your Honor.

03:29:45  15          This one is different because he was drunk and high

16     at the same time.  We heard his wife up there weeping about

17     how he always does this.  He is always drunk and high at the

18     same time.  And I was looking for it, I know I cited the

19     exact paragraph in my sentencing memorandum, but it's an

03:30:03  20     uncontested fact in the PSR that the police also found a

21     warm bowl of marijuana sitting out there on that same table

22     when they went.  So he was using marijuana.  He has admitted

23     it.  He was using marijuana and alcohol at the same time.

24     So, it's not just the fact that he was drunk, he was high at

03:30:20  25     the time that he possessed the bombs that he was charged

with, and that he was shooting out the back.  And I think

what we just saw in the video illustrates pretty clearly why

this is a dangerous person, the type that the founding

fathers would have countenance taking weapons away from;

somebody who has a problem with alcohol, has a problem with

drugs, uses them together in a dangerous way, with dangerous

weapons.  So not only shooting at -- we got to see the

propane tank -- shooting in the direction of a propane tank

in a residential neighborhood, with a weapon that he had

modified to be almost a machine gun, so that's just on that

one day, but he also possessed the weapons on other days

later when he was under a personal protection order not to

go to the house, and we saw what he did, which is go to the

house, dress up like a soldier, with an AR-15 again, clearly

drunk.  So what we are seeing is not the Daniels style

occasional user of marijuana who is sober at the time, we

are seeing somebody who has an ongoing problem with

marijuana, who keeps making bad errors in judgment that put

the public in danger.

THE COURT:  So if I appreciate your position

vis-a-vis Daniels, you think Daniels is not properly

decided, even though the offender in that case was sober?

MR. KESSLER:  Yes, I think it's not --  Correct.

Those are two different things.

First off, Daniels is not correctly decided,

1    even though the person was sober there, because I think they

2    had too tight of a reading of how close the prior regulation

3    had to be that you find in history and tradition.  That, I

4    think, is the first part.  And then the second part is, this

03:32:05    5    is a different case.  As applied to Mr. VanOchten, he is

6    dangerous on an ongoing basis because of his irresponsible

7    use of marijuana in conjunction with alcohol and high

8    powered weapons.

9          THE COURT:  All right.

03:32:19    10          MR. KESSLER:  The last thing I would say is, you

11    asked my colleague here about the impact of Rihimi,

12    Michigan.  I don't think it's going to resolve (g)(3) all by

13    itself, because it's a different issue.  A large part of

14    Rihimi is going to go to whether the nation has a history

03:32:37    15    and tradition of disarming people who are involved in

16    domestic violence, which is a completely different subject.

17    But I think what they will have in common is addressing this

18    same issue that's like issue number one that we've been

19    talking about here, which is how much leeway does Congress

03:32:51    20    have under the history and tradition of this country in

21    order to put into place regulations that protect the public.

22    And I think they are appropriate in this case and shouldn't

23    be messed with.

24          THE COURT:  All right.  Thank you.

03:33:04    25          Well, to say that interpretation of the Bruen case

1       is having a major impact on litigation in many of the

2       subsections of Section 922, the government takes the

3       position that Daniels was wrongly decided, and it is not

4       binding on this Court, because it's an out-of-circuit

03:33:38   5    opinion.

6               There are no Sixth Circuit cases presently

7       available for the Court to consider on this particular

8       subsection of 922, and indeed, I don't think there is any

9       Sixth Circuit case post Bruen that would be helpful for the

03:33:59  10   Court to consider as binding precedent to resolve this

11      particular issue.

12              The bottom line here is the Court is -- the Court

13      is going to agree with the government that the scoring of

14      the guidelines under the facts and circumstances of this

03:34:25  15   case are appropriate for the reasons stated in the

16      government's papers.

17              The condition of the defendant at the time of the

18      arrest, that being, apparently intoxicated with a blood

19      alcohol level of .15, and as Mr. Kessler appropriately

03:34:56  20   points out, also having consumed marijuana with a warm bowl

21      of marijuana in close proximity to where he fired shots

22      towards a propane tank which, of course, if it had been

23      penetrated by the ammunition fired from the gun, would have

24      caused a major explosion.

03:35:24  25           So, the Court accepts the government's argument

1    that this statute as presently written is within the history

2    and tradition as described in the Bruen case.  That this is

3    a statute written by the Congress which has been in effect

4    for a very significant period of time.  And in the Court's

03:35:49  5    judgment, does pass muster under the Bruen decision as

6    outlined in the government's -- in the government's papers

7    before the Court today.

8         I recognize this is an issue which will ultimately

9    be decided by the appellate courts of this circuit, as well

03:36:16 10   as ultimately the United States Supreme Court.  The next

11   chance the Court has in explaining the contours of the Bruen

12   decision will occur in this term of the Supreme Court with

13   an argument in a case in the fall.  We will get more

14   guidance at this point, but based on the status of the

03:36:39 15   caselaw now, the Court finds that the government has met its

16   burden here to show that the statute is valid post Bruen.

17        The Court would also note the Overholser case,

18   O-v-e-r-h-o-l-s-e-r, at 2023 Lexis 108630, a Northern

19   District of Indiana case, obviously in the Seventh Circuit,

03:37:11 20   but a district court case out of the Northern District of

21   Indiana, as further support for the Court's ruling.

22        So with that, the objection of the defendant as to

23   Paragraphs 30 and 31 are overruled.

24        The objection to Paragraph 32 has been withdrawn,

03:37:41 25   and accordingly, the adjusted offense level for this case is

26, the -- and the Court will resolve the issue of

acceptance of responsibility during allocution and, of

course, that would affect the guideline calculation in this

case.  If acceptance is granted, the guideline range is 46

03:38:13   to 57 months.  If it is not, the guideline range becomes 63

to 78.

So with that, any further objections from the

defendant regarding the guidelines?

MR. TILTON:  One moment, please, your Honor.

03:38:33   THE COURT:  Sure.

(Pause in proceedings.)

MR. TILTON:  No additional objections, your Honor.

THE COURT:  All right.  Thank you.

Mr. Kessler, allocution on behalf of the

03:38:56   government.

MR. KESSLER:  Yes, your Honor.

So that brings us, I think, to the acceptance of

responsibility issue, your Honor, and I think we have the

evidence we need now.  That's why I wanted to play the

03:39:10   audio, although I had transcribed it for the sentencing

memo, you can hear it when he is first interviewed about the

bombs, you can hear it in his voice, that he is making it up

as he is going along.  He professes to have all of this

certainty now, after he has talked to a lawyer and after he

03:39:28   has had time to think of something for the Court, he has a

very specific story, which is, I couldn't get the salmon to

bite -- and I'm going to pronounce this wrong -- but the Au

Gres River, and that's why I made these explosives.

First off, that makes no sense.  There's no reason

why you would need to make metal bombs that can fragment and

throw shrapnel in order to get fish.  We hear stories all

the time about kids throwing M80s in the water to watch what

happens or whatever, you don't need to make a pipe bottom

for that.

But when you go back and hear what he actually said

when he was first was confronted about it, he didn't have a

chance to think of something.  So you could hear him making

it up as he goes along.  I'm not going to play it again.  If

the Court would like to hear it.  But you can almost hear

the gears turning in his head as he's saying, I can't

remember, I can't remember what it was.  Oh, yeah, I think

that maybe this buddy of mine and I, we went out to go blow

up some ditches and watch the water fly, and we were fishing

for carp.  Everything about it is different, too, than the

statement he makes now.  He says ditches and he says carp,

and the whole reason was just to watch the water fly.

Whereas now it's salmon in the Au Gres River, because they

weren't biting.  It's a different story.  And I think if we

had a trial, I mean you've seen many many times where

whatever lawyer it is who is on the other side of a story

1    like this, is always going to point out that memory doesn't

2    get better and sharper with time.  Suddenly now he remembers

3    everything with total clarity in a way that benefits him,

4    but at the time, he had this very unlikely sounding

03:41:00    5    scenario.

6         Now, there is other inconsistencies as well.  We

7    hear this whole thing about how, I believe he said in his

8    sentencing memo that he had gotten rid of the bomb or

9    forgotten about it 20 years ago or something like that.  But

03:41:12   10    in the audio, he talks about it being 12 years ago.  All of

11    that -- the timing doesn't matter all that much.  And I

12    think the defendant wants to make a big deal about this by

13    saying well, that powder hasn't been manufactured for a long

14    time, as if that proves what his intent was.

03:41:28   15         First off, we heard the testimony of an ATF agent

16    who would know about this, that bomb -- gunpowder is stable,

17    and can be used for a long time.  And the fact that maybe he

18    had a can of gun powder from a long time ago doesn't mean he

19    didn't make the bomb recently.  It also means -- doesn't

03:41:45   20    mean he didn't make the bomb back then with the intent to

21    hurt people.  We are getting off on a sidetrack there.  The

22    issue isn't when he made the bomb.  The issue is what he

23    intended to do with it, and that's why I actually asked the

24    Court to consider whether there is actual acceptance of

03:42:00   25    responsibility here.  Because what he is trying to do is

paint a picture of himself as this harmless guy, and it's

wrong on every front.  He says, "I was just making the bombs

for fishing, so you don't have to worry."  And it's the same

thing you saw him saying to the police officers when they

went to his house, "Oh, yeah, it's all good."  He said it

three or four times at the door, "Don't worry about it.

It's all good.  It's all good.  Oh, no, no, nothing to see

here."  That's what he is trying to say to the Court here

is, don't worry about it.  This was just for fish, nothing

to see here.  You know that's not true.  We all know that's

not true from the evidence that we have seen here.  This was

surrounded by manuals on how to hurt other people.  The

Militia Battle Manual that he had underlined with things

about how to use the same kinds of bombs that terrorists

like McVeigh used to blow up the federal building.  That's

what he is interested in.  It's not fishing books that are

around here.  We saw nothing about fishing, and we've heard

no evidence from anybody or anything that would back him up,

other than his self serving statement that he only made the

bombs for fish.

        When you look at the whole picture, it is obvious

what he wanted to make these bombs for.  It's the same

reason he had a sniper rifle and a binary trigger AR-15, and

all these fake uniforms and a helmet and everything.  And

it's the same thing we heard him say in his own recorded

1  voice which is, "I want to go to war for these men who got

2  wrapped up in January 6.  I want Nancy Pelosi's head on a

3  stake."  That's why he wanted the bombs.  And I think when

4  he comes in here and says that the whole reason I had all

03:43:32  5  this stuff was because I have a hobby of collecting military

6  collectibles, and because I was interested in fishing with

7  them a long time ago.  The Court should be offended and look

8  at that and say he is lying to us about why he was doing

9  this.  Why he was doing it was dangerous, your Honor.

03:43:54  10  Do you want me to address statutory sentencing

11  factors at this point?

12  THE COURT:  Go ahead.

13  MR. KESSLER:  Okay.  So this is actually brief.

14  I think the two that really jump out to me are,

03:44:02  15  first, protection of the public.  We have people like this,

16  too many of them right now, who get geeked up on

17  misinformation, they get angry about things beyond all

18  reason, which is what you heard here.  And I think

19  deterrence.  That people who are consuming the same media

03:44:19  20  and the same information and being made angry, are always

21  tempted to do this sort of thing.  And every time we have

22  somebody who actually gets the punishment that the

23  guidelines set out for this, I think it sends a strong

24  deterrent message that it won't be tolerated.  Because this

03:44:35  25  is the kind of thing that could really hurt other people.

1    Even if he didn't intend to, this man had anti-personnel

2    bombs in a tin box in his house.  He could have blown up his

3    whole house.  He could have blown up half the neighborhood

4    shooting a propane tank.  This is the kind of dangerous

03:44:52  5    behavior that really can't be tolerated because, and it

6    needs to be deterred because it is bad for the protection of

7    the safety of the public.

8        Now, looking at the PSR, the recommendation from

9    probation is actually for a slight downward variance from

03:45:06 10    the guideline range, and I have the greatest respect for

11    probation, but I have to disagree with them on this one.  I

12    can't see any good reason why he should get a pass or get

13    lenient treatment in this case, especially when he is coming

14    in here and lying to the Court about what he intended to do

03:45:22 15    with these bombs.  We shouldn't send a message that somebody

16    of his demographic is going to get a pass, because I been

17    doing this, as Mr. Tilton has, for over 20 years.  I can't

18    even count the number of young men who are 19, 20 years old,

19    who have one small felony for something, and they have one

03:45:41 20    pistol that they didn't shoot somebody with, and they get a

21    much longer sentence than probation is recommending.  And he

22    had bombs, not a pistol, and he had an armory full of

23    AR-15s, including one that was made into almost a machine

24    gun.  And unlike most of those people, he actually said what

03:45:58 25    he intended to do with it.  He wants to go to war.  I think

1    all of that is important in this case.

2         Now, you saw it with the way the Kalkaska County

3    Sheriff's Office treated him.  They treated him with great

4    respect and kid gloves.  I don't want to say it's because of

03:46:15   5    his demographic, but they, you know, they treated him very

6    very professionally, and people all over the country don't

7    always get treated that way.  I don't think we should make

8    that same assumption that he is harmless just because he

9    presents in a certain way.

03:46:28   10        If you read the letter that he sent to the Court,

11   and you see the video the way he talks to law enforcement,

12   he always tries to butter everybody up, and he plays up that

13   image that I'm this harmless, middle class, middle aged

14   white guy that you don't have to worry about.  And he says

03:46:44   15   things like, "I love law enforcement.  I love the flag.  I

16   love our military troops."  Which has nothing to do with

17   anything.  The only reason he puts that in the letter is to

18   try to say to this Court somehow, we are all on the same

19   team, but you know what is actually in his mind, because --

03:46:58   20   and that's why I played those snippets from the initial

21   encounter, three, four times he says, "I'm not the threat

22   here.  I'm not the enemy" with the emphasis on I.  In other

23   words, we are on the same team.  I love you guys.  You and

24   me, we are on the same team.  But what he is saying is there

03:47:15   25   is an enemy.  When he says, "I am not the enemy," he is

saying there is an enemy, and it's one of us, other

Americans with whom he doesn't agree, like Nancy Pelosi,

whose head needs to be on a stick, or Chuck Schumer or

whatever.  Whatever his political motivations are, he wants

03:47:35   to hurt other Americans.  This whole idea of a peaceful

Terry is a fiction.  He brings in these letters that say

that he is a man of faith, and that he regularly attends the

Catholic church, and he can be counted on.  And that's

again, that's buttering up the Court with this idea that I'm

03:47:50   one of you, I share your religion, you don't have to worry

about me.  The real Terry VanOchten, we heard it in his own

words, and we saw it in his actions.  He violates a personal

protection order in order to stalk his ex-wife.  Can you

imagine how frightening that would be, to be his ex-wife,

03:48:08   who we saw weeping up there, because he is constantly

getting drunk and stoned and doing this crazy thing with the

guns.  She's weeping from fear, has to get a personal

protection order from the county court, and goes home one

day and finds him in the house, dressed in full combat gear,

03:48:25   drunk, with a gun, with the helmet on, in her house, and

then does it again.  And he acknowledges that he's got a

personal protection order, he knows that, and they have to

take him out of the house under arrest.  That's the real

Terry VanOchten.  He lies to the Court about why he has the

03:48:42   guns.  He lies to the Court about why he has the bombs.  All

of that.

In the end, I don't think we can take his word for it when he says, "It's all good."  Because I think that is the same thing he said to those officers is what he is trying to tell the Court here.  It's all good.  It's all good.  And it's not, your Honor.  And that's why I think a guideline sentence is appropriate in this case.

THE COURT:  Thank you, counsel.

Mr. Tilton.

MR. TILTON:  Thank you, your Honor.

Your Honor, I think the government and I agree that on this acceptance of responsibility issue we have gotten sidetracked.  I think ultimately the Court has discretion.  The issues that the government has raised about whether Mr. VanOchten is truthful or not about whether it was carp or salmon, I don't think that these are material issues.

The guideline says that the entry of a guilty plea, this is Note 3 to 3E1.1, "Prior to commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction and truthfully admitting or not falsely denying any additional relevant conduct for which is accountable under 1B1.3 will constitute significant evidence of acceptance of responsibility for the purpose of Subsection A."  I think he has admitted the offense from the start.  What I heard when he had that interview with the

1    deputy in Kalkaska was the deputy asked him about the pipe

2    bombs, and he said, yes, I have them, and he told the deputy

3    about them, that they were in ammo cans.  I think he has

4    accepted responsibility.  He has told the officers about

03:50:31   5    making those pipe bombs from the start.  And there isn't an

6    issue here of denying relevant conduct that he would be

7    accountable for under 1B1.3.

8           Additionally, Agent Choi testified today, testified

9    about the government's investigation, about her

03:50:48  10    investigation, and about all of those exhibits that we saw

11    today that were turned over to the government prior to Mr.

12    VanOchten's Indictment.  I think it's important to go back

13    to the plea agreement in Paragraph 9, and this is ECF 32,

14    Page I.D. 161, the plea which was taken in this Court, and

03:51:10  15    there is an acceptance of responsibility statement.  It says

16    that the U.S. Attorney's Office agrees not to oppose the

17    defendant's request for a two level reduction of his offense

18    level for acceptance of responsibility under Section

19    3E1.1(a) of the sentencing guidelines.

03:51:26  20           The defendant reserves the right to object to the

21    defendant's request if it subsequently learns of conduct by

22    him that is inconsistent with the criteria set forth in the

23    commentary of Section 3E1.1.

24           By the time that Mr. VanOchten came in here and

03:51:41  25    pled guilty, he had already revoked -- his bond had been

1    revoked at our request, and the government was aware of all

2    of the conduct which is alleged here today, which should be

3    held against him in determining acceptance of

4    responsibility.

03:51:55   5            The last paragraph of the plea agreement is the

6    typical paragraphs that says it's the complete agreement,

7    and so the government didn't put anything in there about

8    statements.  They knew his position prior to the plea, about

9    why he constructed those bombs, and the only thing, I guess,

03:52:14   10   that changed that we have heard about today is whether it

11   was for carp or salmon and whether it was a ditch or a

12   specific river.

13           I think Mr. VanOchten, and he is going to address

14   the Court here in a minute, has met the requirement for

03:52:30   15   acceptance of responsibility, and I think his statement

16   today should be taken into consideration as well.  He has

17   always admitted that he built those bombs.  He has never

18   denied that from the first time that he was confronted about

19   that.

03:52:44   20           Additionally, I think when the Court is looking at

21   what sentence is appropriate here, I agree with the

22   probation department that a sentence below the advisory

23   guideline range is appropriate.  And I'm not asking for any

24   special treatment for Mr. VanOchten.  What I'm asking is

03:53:03   25   that the Court look at his prior history.  He is 57 years

1    old.  He is in Criminal History Category I.  He has a long

2    history of working.  He has a long family history.  He has

3    had a very difficult year where he's admittedly made some

4    poor decisions, but I think looking over the span of the 57

03:53:26   5    years that he has been alive, those decisions have been

6    confined to the last year, and I think that they have been a

7    result of alcohol use and mental health issues.  It's a very

8    rare thing that a defendant willingly wants his attorney to

9    file a revocation -- a motion for revocation of bond when

03:53:48  10    he's never spent any significant period of time in jail, and

11    I think --

12         THE COURT:  That was going to happen anyway, wasn't

13    it, based on the record?  Can you imagine a magistrate judge

14    of this court not revoking bond based on the record that Mr.

03:54:02  15    VanOchten had rolled up while he was on bond?

16         MR. TILTON:  Well, what I would add is we did have

17    some bond revocation hearings, and at that point, the

18    magistrate judge had not revoked his bond.  I think that Mr.

19    VanOchten --

03:54:16  20         THE COURT:  Put it this way.  Can you imagine that

21    I wouldn't have revoked his bond under the circumstances?

22         MR. TILTON:  It's very possible, your Honor.  But I

23    do think it's significant that he was the one -- that we are

24    the ones that came to the government, to the Court and said,

03:54:32  25    he needs to be in custody for his own benefit at that point.

1    And I think he has had time now, he has been in custody

2    since May, and he's had time to evaluate what got him here,

3    why he is here, why he is coming in front of you today in

4    custody versus off of the street, and the changes that he

03:54:52  5    needs to make in his life to get back to the family that

6    supports him.  He has a number of family members who are

7    here today; his girlfriend, his mother, and his sister.  Mr.

8    VanOchten's going to apologize to them for his behavior.

9    And he is also going to -- while his ex-wife and his

03:55:10  10   ex-stepdaughter are not here today, he is also going to

11   apologize to them, because while they may not be --  Let me

12   put it this way:  He realizes that his own actions have had

13   consequences on himself and had consequences on the people

14   around him.  And I think when the Court looks at the 3553(a)

03:55:33  15   factors, I think that his history and characteristics, I

16   think that these would point towards a sentence below the

17   advisory range.  I think he has been specifically deterred.

18   And I think the Court can create a sentence that is below

19   the range that addresses the remaining purposes of

03:55:53  20   sentencing.

21        Thank you.

22        THE COURT:  Mr. Tilton, as far as recommendations

23   to the Bureau of Prisons, sir, go ahead.

24        MR. TILTON:  Your Honor, we would specifically ask

03:56:02  25   for mental health treatment and evaluation, substance abuse

treatment, and -- well, evaluation and treatment, any

vocational training that's available, and placement as close

to --

          THE COURT:  Close to home?

          MR. TILTON:  Yes, your Honor.

          THE COURT:  Is he going to be eligible for RDAP

given the count of conviction here?

          MR. TILTON:  I don't believe that he would be

eligible for the reduction.  I think it is always beneficial

to make the recommendation, because I think he would benefit

from the program.

          THE COURT:  All right.  Thank you, sir.

          MR. TILTON:  Yes.

          THE COURT:  Mr. VanOchten, is there anything you

wish to say on your own behalf, sir?  You may proceed as you

wish.

          THE DEFENDANT:  Yes, sir.  I would just solemnly

like to apologize to you and this Court.  I'm very sorry.  I

behaved immaturely.  I made some poor -- very poor

decisions.  I'm truly not a bad man, your Honor, but I have

done some things that in the past couple years, with the

onset of COVID, and my father passed, I had some issues.  I

know it's no excuse, but I turned to alcohol, and that's

basically what got me into this whole mess.  And I'm not --

like I say, there is no excuse for it.  There is no excuse

1   for the items that I had in my possession either, you know,

2   I'm extremely sorry about that.

3           I just want to let you know that I want to say that

4   I'm sorry to my community, to my ex-wife's family, and to my

03:57:39   5   family specifically for what I've put these people through.

6   They deserve better from me, and I am a better person.

7           When I look back -- I've had some time to think

8   about this, and I look back at myself and what I've done,

9   I'm just so ashamed.  I don't even know where to start.  I

03:57:54   10  just want to let you know that I am better than that, I

11  truly am.  And I just hope that you can understand that I am

12  a trustworthy and an honorable man, I really am.

13          There is --  Them devices, I've told the absolute

14  truth about that, sir, about their purpose and their intent,

03:58:13   15  and that's exactly what they were for.

16          THE COURT:  What do I make, Mr. VanOchten, of your

17  conduct while on bond and your violation of the Kalkaska

18  County PPOs?

19          THE DEFENDANT:  The one --  The PPO that he was

03:58:33   20  referring to that the prosecution was referring to wasn't

21  actually -- I was out on probation at that time when she had

22  tooken that film.  The only other time was I was when they

23  had told me that I was a PPO was against me, my wife had

24  moved out for a week, so I was there getting stuff ready to

03:58:51   25  move.  I knew that I wasn't supposed to be there.  She was

1    actually with her daughter at that time, and they came home

2    -- or she came home and called the police, that -- it's a

3    totally different instance there.  It was only one time, and

4    in my probation officer even, you know, had said that, you

03:59:08   5    know, you weren't supposed to be there, you were packing

6    your stuff, you were getting out, I was doing stuff to try

7    to help her, I was cleaning out the garage so she could get

8    her vehicle inside.  I was trying to help her is what I was

9    doing.  I understand I wasn't supposed to be there, but I

03:59:20   10   wasn't there drinking at that particular time at all.  When

11   I was drinking --

12       THE COURT:  So you were packing in the garb that

13   you had in that picture?

14       THE DEFENDANT:  No, that's what I was saying.  That

03:59:29   15   was from before the PPO was issued, that garb.  They have

16   got that wrong.  That was while I was on probation before.

17   The PPO didn't come out until November 9th.

18       THE COURT:  Did you have a probation condition

19   ordering you to stay away?

03:59:45   20       THE DEFENDANT:  No, sir, I didn't.  I was living

21   there the whole time, going to work.  What it was is -- and

22   I had quit drinking for probably two months, and I had

23   basically fell off the wagon is what it was, and it was me

24   feeling sorry for myself.  There was no intent to ever hurt

04:00:01   25   anybody.  I'm not that kind of a person.  It's how I kind of

1    deal with things, I guess.  It's not normal and, you know, I

2    understand I do need help.

3          As far as the drinking goes, sir, I am done with

4    that.  I'm honestly -- I know everybody says that, but

5    seeing what I put my family through, it destroys me, it

6    really does, and I will not drink ever again.  And I just

7    want to let you know that you are never going to see me in

8    here again.  I've learned such a lesson on this, a life

9    lesson.  It's an understatement what kind of lesson I've

10   learned so far.  And I'm just extremely sorry.  That's all I

11   can say, sir.  I'm so very sorry.  It was never my intent to

12   hurt anybody.  I did go on a drunken rant one time, you

13   know, and that's where the audio came in.  In no way would I

14   ever attempt to hurt anybody, sir.  Never in my life have I

15   ever been to any kind of violence at all.  I'm not an

16   abusive person, I'm not a violent person.  I have kind of an

17   odd hobby, I guess you would say.

18         No, I just don't even know what else to say.  I

19   just want to convey to you how very sorry I am and, your

20   Honor, I'm not going to be back.  I definitely have learned

21   my lessons here, sir.

22         Thank you.  Thank you.

23         THE COURT:  Thank you.

24         THE DEFENDANT:  Thank you for your time, your

25   Honor.

1          THE COURT:  It's the Court's duty to impose a

2     sentence sufficient but not greater than necessary to comply

3     with the purposes of sentencing set forth in 18 U.S. Code

4     3553(a).

04:01:33   5          The Court recognizes the guidelines are advisory to

6     the Court, but I have taken the guideline into account as an

7     initial benchmark or a starting point when sentencing in

8     this case.

9          I recognize I must make an individualized

04:01:43  10     assessment based on the facts presented.  The guideline

11     range is one of the array of factors warranting

12     consideration.

13          I also fully recognize my discretion in determining

14     an appropriate sentence, as recognized by the United States

04:01:58  15     Supreme Court in its decisions in Booker, Kimbrough, Rita,

16     Gall, Spears, and the Sixth Circuit case of Herrera-Zuniga.

17          Pursuant to Tapia vs. The United States, at 131

18     Supreme Court 2382, the Court recognizes that imprisonment

19     is not suitable for the purpose of promoting correction and

04:02:18  20     rehabilitation.  I have considered all of the defendant's

21     arguments in support of his request for a lower sentence.

22          The 3553 factors are the nature and circumstances

23     of the offense and the history and characteristics of the

24     defendant.  The sentence must reflect the seriousness of the

04:02:33  25     offense; promote respect for law; provide just punishment

1    for the offense; afford adequate deterrence to criminal

2    conduct; protect the public from further crimes of the

3    defendant; provide the defendant with needed medical,

4    educational, and/or correctional treatment; the need to

04:02:48  5    avoid unwarranted sentencing disparity among similarly

6    situated defendants; any guideline policy statements that

7    pertain; and the kinds of sentences available to the Court.

8         First, as far as recommendations to the Bureau of

9    Prisons is concerned:  The Court recommends the defendant

04:03:05  10   receive substance abuse treatment and counseling while he is

11   incarcerated.

12        I recommend that he be screened for the RDAP

13   program, which is the best substance abuse treatment program

14   within the jurisdiction of the Bureau of Prisons.

04:03:18  15        Mr. VanOchten would benefit from a mental health

16   assessment and any treatment and counseling the mental

17   health professionals of the Bureau of Prisons deem to be

18   appropriate.

19        Third, that he receive vocational/educational

04:03:31  20   opportunities while he is incarcerated.

21        And that he be housed in a facility as close to his

22   home as possible.

23        The Court's had the benefit of the sentencing

24   memoranda and attachments by the government and the

04:03:46  25   defendant.  The defendant obviously has support in the

1    community moving forward, which he will undoubtedly lean on

2    while he is serving his sentence.

3          The Court also notes that the defendant is in

4    Criminal History Category I, with one point on his criminal

04:04:05  5    history, which is clearly indicative of a period of --

6    significant period of time during his life that he was a law

7    abiding citizen.

8          Unfortunately, in 2022, the defendant placed

9    himself in a very difficult position by making some very

04:04:31 10    wrong decisions regarding his conduct, not only as far as

11    the offense of conviction here is concerned, but also

12    conduct that he participated in while on bond to this Court,

13    as well as while he was on probation.  It's hard for me to

14    understand why a probation officer would blow off the

04:04:56 15    conduct that he was presented with, but in any event, Mr.

16    VanOchten seemed to minimize the probation officer's

17    concerns there.  I'll accept that explanation, but I'm

18    surprised, let's put it that way.

19          The first issue for the Court to consider, of

04:05:16 20    course, is acceptance of responsibility, and the government

21    has some very apt arguments to make as it relates to the

22    granting of the two levels for acceptance of responsibility,

23    which obviously would also implicate the third level based

24    on the government's motion that the defendant pled timely.

04:05:38 25    The Court views this as -- the Court views this as a very

close issue.  I am going to give the defendant the benefit

of the doubt and give him acceptance of responsibility, and

given the government's motion, a total of three levels for

acceptance.  Accordingly, the guidelines are as calculated

by the Court's probation office as 46 to 57 months.

The nature and circumstances of this offense and

the defendant's conduct on the date he was arrested is very

concerning to the Court.  Concerning the nature and

circumstances of the offense.  The devices that he had were

potentially ones that could do great damage if improperly

used.  There is no allegation by the government that just

previous to his arrest that the defendant had been misusing

these devices, but the Court is concerned about some of the

defendant's statements in close chronological proximity to

his possession of these devices regarding -- especially the

reference to going to war, and a reference to certain

officials.  You obviously have a First Amendment Right to

express your personal political views, but on the other

hand, there is no right to threaten or potentially threaten

elected officials.

Mr. VanOchten needs to be specifically deterred.  I

think that's a major factor for the Court to consider.  And

given Mr. VanOchten's conduct as it relates to the PPO, as

well as his conduct while on bond to this Court, another

specific concern of the Court is promoting respect for law.

Mr. VanOchten was, shall we say, not in compliance with his

bond, and I think that reflects the respect he has for the

laws of the United States.

I also must be mindful of general deterrence of

others who might contemplate similar criminal activity.  At

the time he was he was arrested, Mr. VanOchten represented a

threat to the public, in the Court's judgment.  Now, that's

not to say that if he takes to heart the substance abuse

treatment and counseling that he gets, as well as the mental

health assessment, which I think he would benefit from, that

he can't come out of prison and successfully complete

supervised release.  But protection of the public from

further crimes of the defendant as he sits here today is a

concern of the Court as well.

The Court recommends --  The Court recognizes, not

recommends, but the Court recognizes the recommendation of

the Court's probation office here, but in the Court's

judgment, that recommendation misses the mark in considering

all of the 3553 factors, including the seriousness of the

offense; promote respect for law; and provide just

punishment for Mr. VanOchten's actions.  The Court finds

that a sentence in the middle of the advisory guideline

range is the appropriate sentence in this case.

Accordingly, it's the judgment of the Court the

defendant is committed to the custody of the Bureau of

1   Prisons for a term of 52 months.

2          Upon release from imprisonment, the defendant shall

3   be placed on supervised release for a term of three years.

4          Within 72 hours of release from custody of the

04:09:27   5   Bureau of Prisons, the defendant shall report in person to

6   the probation office in the district to which he is

7   released.

8          While on supervised release, the defendant shall

9   comply with the mandatory and standard conditions of

04:09:39   10   supervision, including DNA collection and drug testing.

11          The following special conditions of supervision are

12   ordered:

13          Participate in a program of testing and treatment

14   for substance abuse, as well as mental health treatment as

04:09:53   15   directed by his probation officer.  Follow the rules of the

16   program until he is released from the program by his

17   probation officer, and pay at least a portion of the cost

18   according to his ability to pay, as determined by his

19   probation officer.

04:10:06   20          He must not knowingly purchase, possess,

21   distribute, administer, or otherwise use any psychoactive

22   substances or paraphernalia related to controlled

23   substances, including synthetic marijuana and bath salts

24   that impair a person's physical or mental functioning,

04:10:24   25   whether or not intended for human consumption.

1          He must not use or posses any controlled substances

2     without a valid prescription.  If he has a valid

3     prescription, he must follow the instructions on the

4     prescription.

04:10:35   5          He must not possess, use, or sell marijuana or any

6     marijuana derivative, including any product containing CBD

7     or THC in any form, including edibles or for any purpose,

8     including medical purposes.  He is also prohibited from

9     entering any marijuana dispensary or grow facility.

04:10:56  10          He must submit his person, property, house,

11     residence, vehicle, papers, computers, and other electronic

12     devices to a search conducted by the United States Probation

13     Office.  Failure to submit to a search may be grounds for

14     revocation of release.  He must warn other occupants of the

04:11:11  15     premises that he lives or works that the premises is subject

16     to search pursuant to this condition.  The probation officer

17     may conduct a search under this condition only when

18     reasonable suspicion exists that he has violated a condition

19     of supervision and that the areas to be searched contain

04:11:28  20     evidence of the violation.  Any search must be conducted at

21     a reasonable time and in a reasonable manner.

22          The special assessment of $100 is ordered due and

23     payable immediately.

24          The Court does not intend to impose a fine in this

04:11:43  25     case.

1          Mr. Tilton, any other recommendations to the Bureau

2     of Prisons that you would like?

3          MR. TILTON:  No, your Honor.  Thank you.

4          THE COURT:  Any legal objection to the sentence

04:12:06  5     imposed, other than those objections already on the record?

6          MR. TILTON:  No, your Honor, nothing new.

7          THE COURT:  Are you satisfied I've addressed all of

8     your arguments on the record?

9          MR. TILTON:  Yes, your Honor.

04:12:13 10          THE COURT:  Thank you.

11          Mr. Kessler, any legal objection to the sentence

12     imposed?

13          MR. KESSLER:  No, your Honor.

14          THE COURT:  Is there a forfeiture allegation here?

04:12:20 15          MR. KESSLER:  No, there's not, your Honor.

16          THE COURT:  All right.  Thank you.

17          Mr. VanOchten, I advise you, sir, you can appeal

18     your conviction if you believe that your guilty plea was

19     somehow unlawful or involuntary, or if there is some other

04:12:31 20     fundamental defect in the proceeding not waived by your

21     guilty plea.

22          You also have a statutory right to appeal your

23     sentence under certain circumstances, particularly if you

24     think the sentence is contrary to law.

04:12:43 25          You have the right to apply for leave to appeal in

forma pauperis, if you are poor.  If you wish to do so, with

a few exceptions, you need to file the appropriate documents

within 14 days of the entry of the judgment in this case.

Your attorney will prepare and file a notice of appeal upon

04:12:59  your request.

Counsel is advised of his obligation to advise his

client of his appellate rights.  Should your client wish to

pursue an appeal, the forms for filing an appeal can be

found on this Court's website or the Court of Appeals'

04:13:12  website.  Should your client choose to appeal, you're

obligated to continue representation of him until such time

as you are specifically relieved by the Court of Appeals.

Mr. Kessler, you are on your feet.

MR. KESSLER:  Yes, your Honor.  I'm sorry.  I

04:13:24  realized as soon as the words came out of my mouth, I

misspoke about the forfeiture allegation.  There is a

forfeiture allegation as to the firearm that had a

projectile launcher under it, he is going to forfeit that

item.

04:13:38  THE COURT:  All right.  The Court will entered the

forfeiture as part of the judgment.

Anything further from the government?

MR. KESSLER:  No, your Honor.

THE COURT:  Mr. Tilton, anything further on behalf

04:13:48  of the defendant?

1                MR. TILTON:  Maybe just a correction on the

2        forfeiture allegation.  The allegation in the Indictment is

3        for the pipe bombs and then there was an additional

4        agreement on the projectile launcher in the plea agreement.

04:14:04    5                MR. KESSLER:  He is correct, your Honor, I'm sorry.

6                THE COURT:  All right.  Thank you.

7                MR. TILTON:  Thank you.

8                THE COURT:  The defendant is remanded to the

9        custody of the marshal for execution of sentence.

04:14:14  10                COURT CLERK:  All rise, please.

11                Court is adjourned.

12            (At 4:14 p.m., proceedings concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, Kathleen S. Thomas, Official Court Reporter for the United States District Court for the Western District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct transcript of proceedings had in the within-entitled and numbered cause on the date hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my direction.


                    /s/
          _____

                    Kathleen S. Thomas, CSR-1300, RPR
                    U.S. District Court Reporter
                    410 West Michigan
                    Kalamazoo, Michigan   49007